THOMAS, J.,
for the Court:
¶ 1. R.L.S., the natural father, appeals the lower court’s denial of custody modification which preserved custody of the child, D.K.S., with A.R.S., the natural mother.
I. THE CHANCELLOR MANIFESTLY ERRED BY DENYING CUSTODY MODIFICATION CONTRARY TO THE OVERWHELMING WEIGHT'OF THE EVIDENCE.
Finding error, we reverse and render. Although this case was filed with the full name of the parents and child involved stated, in deference to the child involved and the facts of this case, we have chosen to use the initials of the parents and the child.
FACTS
¶ 2. A.R.S. and R.L.S. were divorced on September 16, 1996 on the grounds of irreconcilable differences. Their marriage produced one child, D.K.S., who was born on January 31, 1990. A.R.S. and R.L.S. were awarded joint legal custody of their daughter, and the mother, A.R.S., was awarded primary physical custody. The father, R.L.S. was awarded regular visitation rights which included every other weekend and alternate holidays.
¶ 3. After the divorce, R.L.S. remarried. He is gainfully employed and owns a house in Byram, where he lives with-M.S., his new wife and his fourteen year old stepdaughter, M.S.’s child from a prior marriage. A.R.S. has remained single and resides in an apartment complex in Vicksburg with D.K.S.
¶ 4. On September 13, 1999, R.L.S. filed a motion to modify custody of D.K.S., based on a material and substantial change in circumstances adverse to the best interests and welfare of the child. Hearings were held on September 24 and October 1, 1999 before Chancellor V.R. Barnes of Warren County.
. ¶5. Due to the nature of the case at hand, the remainder of the facts are pre *1253 sented in the order of testimony in the lower court proceeding.
THE TESTIMONY OF D.K.S.
¶ 6. R.L.S. began the case with the direct testimony of D.K.S. Testimony was conducted in chambers due to the private nature of the testimony and the tender age of the witness. At the time of the testimony she was nine years old and in the fourth grade. The child conveyed a thorough understanding of the importance to tell the truth and showed a propensity to do just that.
¶ 7. D.K.S. explained that on the night of August 26, 1999, Eddie Sorey “was messing around with my body.” She testified that Mr. Sorey touched her on her “private parts” and had her touch his also. She stated that Mr. Sorey had been drinking “Vodka with diet coke.” She stated that this occurred while she and her mother were sleeping in the same bed that Mr. Sorey was lying in, watching T.V. She stated that Mr. Sorey would often recline in the same bed and watch T.V. The child sleeps with A.R.S. regularly because her room is too crowded with toys and such.
¶ 8. The next morning, while Mr. Sorey was taking a shower, D.K.S. told A.R.S. what had happened. Before Mr. Sorey was out of the shower A.R.S. told him they were going to work, and she brought the child to Mr. and Mrs. Way’s house. Mrs. Way is A.R.S.’s sister. After telling Mr. Way, who is an attorney, about what had happened, A.R.S. went back to her apartment and told Mr. Sorey to leave.
¶ 9. D.K.S. explained that Mr. Sorey had touched her twice before. Unlike the third molestation, these incidents took place in hotels in Vicksburg, the Ridgeland Inn and Fairfield. The child testified that she enjoyed going with her mother and Mr. So-rey to hotels often because she could swim and have fun. The hotel rooms had two beds, and she would watch T.V. with Mr. Sorey in one bed, while her mother slept in the other. It was in such situations that Mr. Sorey would touch her. Mr. Sorey had been drinking alcohol on these occasions as well. D.K.S. did not tell her mom about the first two times Mr. Sorey touched her until August 27, 1999, when she informed A.R.S. of all three incidents.
¶ 10. On another occasion, A.R.S. told D.K.S., who was taking a bath, that Mr. Sorey was coming in to use the bathroom. After this happened the child told her mother that she did not want Mr. Sorey to come into the bathroom while she was bathing because it made her feel uncomfortable. However, the child recalled that her mother allowed Mr. Sorey to use the bathroom while the child was bathing a second time on a later date.
¶ 11. On Friday, August 27, 1999, the day after the third molestation, R.L.S. picked D.K.S. up for the scheduled visitation weekend. The child had gone home early from school due to a stomachache and headache she had been suffering from throughout the day. During the drive from Vicksburg to Byram, D.K.S. told her father that she had a big secret but would not tell.
¶ 12. D.K.S. refused to eat dinner that night, and asked to make a phone call to her mother, A.R.S. She asked her mother if she could tell her father about the secret. D.K.S. testified that her mother told her “no, not yet [D.K.S.].” The child explained that her mother asked her to keep a secret from her father. She stated that her mother told her, “Don’t tell your dad right yet, because we’ll tell him later on.” However, she wanted to tell her dad because “he needed to know too.” D.K.S. explained that her mother told her that if she told her dad the secret, “he might go and try to find him and try to hurt him [Mr. Sorey].” D.K.S. was scared that she would get in trouble with her mother if she told her father the secret.
*1254 ¶ 13. However, after talking on the phone with her mother, D.K.S. told M.S., her stepmother, that she could only say six words, but nothing else. At that time D.K.S. stated that “Eddie has been searching my body.” D.K.S. explained that she did not keep her secret because “it was bothering me a lot,” and she trusted her father and M.S. When A.R.S. found out that R.L.S. knew about the molestation incidents, the child felt that her mother was mad at her and wept when A.R.S. discussed the matter with her.
¶ 14. D.K.S. met with her school counselor, Ms. Cathy Lee, and her father on the Tuesday following the third molestation. D.K.S. then met with Ms. Clarissa, a counselor from the Department of Human Services (“DHS”) on two different occasions until A.R.S. told her not to speak with anyone from DHS anymore. The child also recalled talking with Ms. Jenene Head about the matter, as well as a counselor in Jackson, whose name she could not remember.
THE TESTIMONY OF A.R.S.
¶ 15. A.R.S. testified that while she and Eddie Sorey had dated in the past, they had not been dating for a year and a half and have “remained good friends.” While they were only friends, A.R.S. and D.K.S. would spend the night in her apartment and hotels with Mr. Sorey on several occasions.
¶ 16. A.R.S. recalled that she and D.K.S. had visited Mr. Sorey at the Fair-field Inn and the Ridgeland Inn during the summer of 1999. She explained that the child enjoyed going to the hotels because she could swim and they would order pizza and watch T.V. However, A.R.S. claimed that the three of them never slept in the same bed together. When asked about the sleeping arrangement on the night of the third molestation, the following testimony occurred:
A. No. [D.K.S.] and I were in my bed, and he [Mr. Sorey] was in a chair sitting by the bed watching TV with us.
Q. Well, if he [Mr. Sorey] was sitting in the. chair — my understanding was that [D.K.S.] said he was in the bed with you?
A. She was incorrect that time. There’s been plenty of times we’d all sit in the bed and watch TV before [D.K.S.] and I would go to bed.
Q. And you’re telling the Court you think it’s appropriate for your nine year old daughter to be in bed with this man and you’re watching tv?
A. Considering that Mr. Sorey would be on the outside of the covers, and [D.K.S.] and I are under the covers, I would say, yes ...
At a later point of her testimony, A.R.S. continued to explain that:
A. He watched TV in the bed. They did not sleep together. You’ve got to get your mind in what I’m saying to you and not in what you would like to perceive it to be.
Q. My simple question to you, [A.R.S.], is: You allowed your nine year old daughter to be in the same bed with Mr. Sorey?
A. Watching television. Yes, uh — huh.
[[Image here]]
Q. And [D.K.S.] and Mr. Sorey ended up in the same bed together at the Ridgeland Inn just like they did at the Fairfield?
A. Just like. Watching TV with Mr. Sorey on top of the covers and probably [D.K.S.], too.
Q. And Mr. Sorey was on top of the covers, I guess, before you went to sleep; is that right?
A. Yes.
*1255 Q. And he obviously got under the covers after you went to sleep?
A. I have no idea.
Q. You don’t know what happened, do you?
A. That’s right.
Q. Because you weren’t watching, were you?
A. I was asleep.
Q. You were sleep. You weren’t watching your daughter and this other man and what they were doing?
A. Had no reason to worry about it.
Q. No reason to worry?
A. That’s right.
¶ 17. A.R.S. stated that on August 27, 1999, the morning after the third molestation, D.K.S. informed her of the molestation that had occurred the night before. Within minutes, A.R.S. took the child to her sister’s house. Mrs. Way, A.R.S.’s sister, is married to Mr. Way, A.R.S.’s legal counsel. A.R.S. consulted Mr. Way at this time. Mr. Way assured A.R.S. that he would notify the proper authorities. A.R.S. did not notify the DHS because she felt that Mr. Way would handle the situation.
¶ 18. Within an hour of leaving her apartment, A.R.S. returned and confronted Mr. Sorey. A.R.S. told Eddie to pack his stuff and never come back or call again. A.R.S. has spoken with Mr. Sorey on the phone at one time since in order to request that he send her files. Mr. Sorey served as A.R.S.’s legal counsel on earlier unrelated matters.
¶ 19. A.R.S. claimed that on the night of August 26, 1999, she had fallen asleep due to the effect of the medicine she had been given during a surgical procedure she underwent earlier in the day. However, A.R.S. later stated that “the main reason that I went to sleep [before D.K.S. and Mr. Sorey did] was because I had to work the next day, and [D.K.S.] did not.”
¶ 20. A.R.S. testified that Mr. Sorey had been drinking on the night of August 26, 1999, and that he “usually” drank alcohol when he visited. She further admitted that “occasionally he may have a drink more than I think he should, but I don’t know anything about abusing [alcohol].” A.R.S. could not recall if Mr. Sorey had drunk to excess on the night of August 26, 1999.
¶ 21. A.R.S. testified that before seeing her father on August 27, 1999, she instructed D.K.S. that they “would keep this to ourselves until [she] had a chance to talk to [R.L.S.].” She denied telling the child to • keep it a “secret,” and claimed that she told D.K.S. that she would tell her father about the incident. A.R.S. discovered that the child had told her father about the situation about a week later. While A.R.S. admitted that D.K.S. was upset and cried when she found out, she claimed that she was not angry with the child at all.
¶ 22. A.R.S. made an appointment for D.K.S. to see a pediatrician at the Warren County Mental Health Center on the Wednesday following the incident. However, due to A.R.S.’s ongoing surgical procedures and difficulties, A.R.S. was not able to take D.K.S. to the pediatrician until Thursday, a full week after the incident occurred. At this time D.K.S. saw Dr. Sluis.
¶ 23. A.R.S. stated that D.K.S. has continued to suffer from stress, nightmares and stomachaches due to the molestations. She continued to explain that D.KS. was receiving counseling in order to learn how to get over such problems.
¶ 24. As to the bathroom incident(s), A.R.S. explained that there was only one bathroom in her apartment, and while she “wasn’t real comfortable with it,” she al *1256 lowed Mr. Sorey to use the restroom while D.K.S. was bathing. A.R.S. testified that this only happened once and D.K.S. did not express that she was uncomfortable about this. A.R.S. adamantly denied that this happened a second time.
¶25. As to her responsibility for the molestation incidents, A.R.S. testified that “If the incidents were going to happen, in my opinion, they would have happened no matter what.” She stated that Mr. Sorey was a close family friend whom she trusted “with everything with [D.K.S.].”
THE TESTIMONY OF R.L.S.
¶26. R.L.S. began his testimony by explaining his living arrangement. R.L.S. has a three bedroom house where D.K.S. has her own room. He stated that D.K.S. has a good relationship with her stepsister and stepmother, and his personal relationship with the child is very close. He stated that he talks with D.K.S. as much as possible and keeps up with her school and daily life. R.L.S. is also in regular contact with D.KS.’s school counselor in order to make sure that she is doing well socially and academically.
■ ¶ 27. R.L.S. had no idea that D.K.S. was in any kind of danger or involved in any kind of improper situations until August 27, 1999. On this day, the day after D.K.S. had been molested by Mr. Sorey for the third time, R.L.S. picked the child up for the scheduled weekend visitation. He explained her actions and demeanor in the following manner:
A. Real nervous, upset. Something was wrong. And wanting to tell me a secret, but said she couldn’t tell me. That she was told not to tell me a secret.
Q. She kept using the word “secret”.
A. Kept using the, word “secret,” yes, sir.
Q. How was she referring to it?
A. A big secret that she promised not to tell me.
Q. Who did she promise this to?
A. Her mother, A.R.S.
Q. Did she tell you that?
A. Yes, sir.
¶28. R.L.S. explained that after they had made it to his house in Byram, D.K.S. called her mother. After the phone call, D.K.S. seemed even more upset than before. At this time D.K.S. began to explain the situation to R.L.S. Throughout the weekend, R.L.S. talked with D.K.S. about the molestations. He did not pressure her because she was so upset about what had happened, yet she gradually explained the situation fully. The child was extremely worried about the fact that A.R.S. had instructed her not to tell R.L.S. about the molestations.
¶ 29. R.L.S. returned the child to A.R.S. on the following Sunday. The next morning he called DHS and set up an appointment to speak with someone about the incident. He then went to D.KS.’s school and spoke with her counselor, Ms. Cathy Lee. He kept in close contact with D.K.S. throughout the week, calling her every night. About a week after the incident, R.L.S.’s calls to A.R.S.’s apartment went unanswered, although he attempted to call every night. During D.KS.’s next visit with R.L.S., she told him that A.R.S. found out that R.L.S. knew about the situation because she had been contacted by the DHS. D.K.S. was crying and very upset about this.
¶ 30. R.L.S. explained that he took the child to see Ms. Brenda Donaldson, a therapist specializing in children, because he was concerned about D.KS.’s emotional well being at the present time and the effect the events would have on her future. R.L.S. felt that it is necessary for D.K.S. *1257 to continue to receive treatment in order to properly handle the situation.
THE TESTIMONY OF BRENDA DONALD
¶ 31. Ms. Donald was accepted by the court as an expert witness, specializing in the evaluation, diagnosis and treatment of emotional behavior disorders involving children and adolescents who have been sexually abused.
¶ 32. Ms. Donald saw D.K.S. on September 11, 1999. It was Ms. Donald’s impression and expert opinion that D.K.S.’s interview with her was accurate and true. The child explained the molestation incidents to Ms. Donald. This explanation was consistent with D.K.S.’s earlier testimony. D.K.S. also told Ms. Donald about how Mr. Sorey would use the restroom while she was bathing and that she had mentioned how this bothered her to her mother, yet A.R.S. continued to allow him to use the restroom while she was bathing.
¶ 33. Ms. Donald discovered that D.K.S. had experienced stomachaches and nightmares that were due to the molestations. D.K.S. expressed a feeling of safety in the presence of her father. Ms. Donald noted that D.K.S.,
was reluctant to talk, especially about her mom. She said her mother had told her not to tell, and I asked who she’s not supposed to tell. She talked about, during this interview, her dad, the police, and the Department of Human Services. Said that her mom did not want her to talk about it, and that Mr. Sorey would be in big trouble if she told, that something really bad would happen to him.
During this interview the child also described Mr. Sorey to Ms. Donald as being A.R.S.’s boyfriend.
¶ 34. Ms. Donald believed that A.R.S.’s reaction to learning of the molestations was inappropriate and unhealthy. Ms. Donald noted that D.K.S. was confused about how her mother was telling her how sorry she was about the incident, and at the same time was instructing her to keep it a secret from her dad, the police and DHS. D.K.S. indicated that her mother had specifically instructed her not to reveal Mr. Sorey’s residence. In consideration of her interview with D.K.S., Ms. Donald believed that A.R.S. was trying to “collude the child into secrecy to protect this man who had violated her. And that’s the conflict, that she doesn’t understand why she’s supposed to protect this man who has done something to her.” Ms. Donald stated that AR.S.’s actions in instructing D.K.S. to keep it a secret were inappropriate and caused D.K.S. to suffer further emotional damage. Such actions gave D.K.S. mixed signals as to what was wrong and what was right involving the situation, causing D.K.S. to have the impression that her mother and protector is aligned with the one who has done her harm.
¶ 35. Ms. Donald further explained that merely placing D.K.S. in “adult situations” such as the times A.R.S. and D.K.S. spent with Mr. Sorey were not only inappropriate, but displayed very poor judgment. She explained that such behavior “blurred boundaries” between D.K.S. and adult situations. Ms. Donald was further of the opinion that placing D.K.S. in such situations was a threat to her safety and security.
THE DHS REPORTS
¶ 36. The court accepted into evidence the record produced by the DHS involving the investigation and interviews with the child, the father and the mother. The DHS reports accurately supported the testimony of D.K.S. and R.L.S.
¶ 37. While interviews with D.K.S. yielded the information that the molester was Mr. Sorey, a lawyer who works with “the Ramsey firm,” further information *1258 was not known to the child. The reports show that A.R.S. “has refused to give the alleged perpetrator’s full name and address to [the DHS]” as well as the sheriff and detective assigned to the investigation. When A.R.S. expressed concern that revealing the identity of Mr. Sorey would be in the newspaper, the DHS reporter informed her that such information could only be accessed by court order. However, A.R.S. still refused to give the needed information.
¶ 38. The reports further show that the investigation was dropped due to lack of evidence and cooperation from A.R.S. After exhaustive review of the record, there is no indication that A.R.S. ever gave Mr. Sorey’s identification, address or whereabouts to the DHS, the sheriff or the detective assigned to the case. In fact, other than the DHS interview with D.K.S., Mr. Sorey is not referred to by name until the trial proceeding in the Warren County Chancery Court, at which point A.R.S. only revealed that his name was Mr. So-rey, he practiced law in Mississippi and he lived in Fort Worth, Texas. Even this slight information is questionable as to its truth.
¶ 39. At this point in the trial, R.L.S. rested. A.R.S. began her presentation of the evidence by taking the stand for a second time.
THE TESTIMONY OF A.R.S.
¶ 40. A.R.S. clarified that she had no intention of protecting Mr. Sorey. As far as Mr. Sorey’s prosecution, A.R.S. stated that: “I hate it’s all come to this, but if he had to do this, he has to pay the price.” She also made it clear at this time that the surgical procedure that she was having on August 26, September 2 and 3, 1999 was a three part colonoscopy.
¶ 41. While A.R.S. stated in earlier testimony that she did not know that D.K.S. told R.L.S. about the molestation until the DHS official notified her, she stated at this time that D.K.S. told her about her conversations with R.L.S. on the evening that D.K.S. returned from R.L.S.’s house. She further claimed that her response was telling D.K.S., “Baby, that’s fine if you told dad.” A.R.S. stated that D.K.S. did not want to tell R.L.S. about the molestation. This was the reason that A.R.S. told D.K.S. that she, A.R.S., would tell R.L.S. about what had happened.
¶ 42. A.R.S. took D.K.S. to see Jenene Head, a counselor, on September 2, 1999. D.K.S. had attended two sessions with Ms. Head at the time of the trial, and was scheduled for another session. A.R.S. also took the child to Dr. Sluis, D.K.S.’s normal pediatrician, for a physical examination. Dr. Sluis informed A.R.S. that D.K.S. had no sign of damage.
¶ 43. A.R.S. testified that when she returned from taking D.K.S. to the Way’s house on the morning she found out about the molestations, Mr. Sorey was not in the apartment. She called him on his cell phone and asked him to return to the apartment. When Mr. Sorey returned, A.R.S. had packed his stuff and had it waiting for him on the kitchen table. She confronted Eddie, stating, “[D.K.S.] said you’ve been sexually molesting her.” Mr. Sorey’s response was, “Oh, I know you must feel ...” A.R.S. told him, “I want you to get your bags. I packed them. I want you to get out of my apartment and don’t you ever come back here or contact either one of us again.” Eddie’s parting words were, “Call me if she changes her story,” as he walked out of the front door.
¶ 44. A.R.S. claimed that she had fully cooperated with DHS, the police and Warren Yazoo Mental Health Center. She further stated that she never instructed D.K.S. to keep Mr. Sorey’s residence a secret.
*1259 THE TESTIMONY OF JENENE HEAD
¶ 45. Ms. Jenene Head was accepted by the court as an expert witness, specializing in the area of children and adolescents or children that have been abused, sexually abused and suffer from emotional problems.
¶ 46. Ms. Head interviewed D.K.S. on September 2 and September 15, 1999. She had a scheduled appointment to meet with D.K.S. again later on during the day of the trial. A.R.S. brings D.K.S. to the sessions and makes the appointments. She has also been interviewed and counseled by Ms. Head. The history surrounding the molestations was gathered by Ms. Head during interviews with A.R.S. Ms. Head had a vague and partial record of the history of the molestations. She explained that her job was not to “delve into the history and the details about how or why,” but, rather, to “try to help them from that point forward.”
¶ 47. Ms. Head intends to help D.K.S. learn to deal with the molestation by teaching her coping skills as well as some personal safety skills. She stated that D.K.S. was still suffering from nightmares and stress, but that her problems were getting better.
¶ 48. Ms. Head described A.R.S.’s home environment as supportive of D.K.S., stating that A.R.S. has helped D.K.S. get through the emotional difficulties involved. Ms. Head advised A.R.S. on September 2, 1999 that she should discuss the situation with R.L.S. A.R.S.’s response was that she would talk with R.L.S. when she could sit down with both R.L.S. and D.K.S. to discuss the matter.
¶ 49. On October 7, 1999, the chancellor entered a memorandum opinion and order denying R.L.S.’s motion. The chancellor aptly cited proper case law and seemed to apply the correct modification of custody standard in an accurate manner, holding that “there has been a material change in circumstances since the divorce decree which has had an adverse impact on the minor child.” However, the chancellor, quite to the contrary of her earlier application of law, concluded that D.K.S. should remain in the custody of A.R.S. based on the “totality of the circumstances.” The pertinent portion of the opinion reads as follows:
The court finds that [R.L.S.] has proven there has been a material change in circumstances which adversely affected the minor child.
The court finds that [A.R.S.] exercised poor judgment by having the minor child keep a secret. By further allowing the minor child to be in a motel room overnight watching television on a male’s bed, allowing the male individual to be in her bedroom watching television with them and allowing him to come into the bathroom while the minor child was bathing.
The court further finds that [A.R.S.] immediately took steps to remove the minor child from this situation.
It is evident from [R.L.S.] and [A.R.S.]’s testimony and observing their demeanor in the courtroom that they have strong animosities toward each other. It is truly unfortunate for them beautiful daughter that they have not put their personal feelings aside.
The success of their daughter’s adjustment to everything that has happened to her will rest in a large degree on how her parents (who both love her very much) will cooperate together to make her live much easier. Regardless of the blame, the ULTIMATE SACRIFICE must be made by her parents. To work TOGETHER to insure that her life becomes less stressful and more of a typical nine year old.
[R.L.S.] and [A.R.S.] must begin showing their daughter that they can *1260 work together for a common goal and that common goal is their daughter’s ultimate HAPPINESS.
The court finds that there has been a material change in circumstances since the divorce decree which had an adverse impact on the minor child.
In considering all the evidence, the law applicable thereto, the totality of the circumstances and the best interests and welfare of the minor child, the court finds that the custody of the minor child should remain with [A.R.S.],
¶ 50. On October 18, 1999, R.L.S. filed a motion to make additional findings or amend the judgment pursuant to M.R.C.P. 52(b), challenging the sufficiency of the evidence in supporting the chancellor’s order. On November 8, 1999, after applying the Albright factors to the evidence, the chancellor entered a second opinion and order, again denying R.L.S.’s motion for modification of custody. The pertinent portion of the second opinion reads as follows:
This court has considered all of the evidence presented in this case, the child’s overall living conditions, the totality of the circumstances and the child’s best interest. The court finds that the evidence presented by [R.L.S.] and the overall factors in this case was insufficient to support a modification of custody.
ANALYSIS
I. THE CHANCELLOR MANIFESTLY ERRED BY DENYING CUSTODY MODIFICATION CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 51. The legal standard pertaining to the modification of child custody has been well established and thoroughly discussed by the appellate courts of Mississippi. The chancellor in the lower court applied the proper precedent in rendering her opinion. In Stark v. Anderson, 748 So.2d 838, 842 (Miss.Ct.App.1999), the Mississippi Court of Appeals made the following summary of the modification of custody standard:
In proceedings to modify child custody arrangements, this Court has stated that the non-custodial parent must satisfy a three part test: “a substantial change in circumstances of the custodial parent since the original custody decree, the substantial change’s adverse impact on the welfare of the child, and the necessity of the custody modification for the best interest of the child.” Brawley v. Brawley, 734 So.2d 237 (¶ 12) (Miss.Ct.App.1999) (citing Bredemeier v. Jackson, 689 So.2d 770, 775 (Miss.1997)) (citing Bubac v. Boston, 600 So.2d 951, 955 (Miss.1992)). Pace v. Owens, 511 So.2d 489 (Miss.1987); Duran v. Weaver, 495 So.2d 1355 (Miss.1986); Smith v. Todd, 464 So.2d 1155 (Miss.1985). This Court has also noted that “the ‘totality of the circumstances’ must be considered.” Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997) (citing Ash v. Ash, 622 So.2d 1264, 1266 (Miss.1993)). Further, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child. Whittington v. Whittington, 724 So.2d 922 (¶ 10) (Miss.Ct.App.1998) (citing Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983)).
¶ 52. In an attempt to clarify the type or magnitude of material change that warrants a modification of custody, our supreme court explained that when the totality of the circumstances display a material change in the overall living conditions in which the child is found which are likely to remain changed in the foreseeable future and such change adversely affects the child, a modification of custody is legally proper. Kavanaugh v. Carraway, 435 *1261 So.2d at 700. The court has also stated that: “It is only that behavior of a parent which clearly posits or causes danger to the mental or emotional well-being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody.” Ballard v. Ballard, 434 So.2d 1357, 1360 (Miss.1983). However, “an isolated incident, e.g., an unwarranted striking of a child, does not in and of itself justify a change of custody.” Tucker v. Tucker, 453 So.2d 1294, 1297 (Miss.1984). In Tucker, the court also made it clear that a modification of custody should never be made for the purpose of punishing or rewarding either parent. Tucker, 453 So.2d at 1297.
¶53. In the case at hand, the chancellor found that there was in fact a material change that adversely affected the child. The chancellor further held that the totality of the circumstances dictate that the custody should not change. After a thorough review of the record, we are unable to comprehend this conclusion. The chancellor cited proper law, applied such law in an appropriate manner, and reached a proper conclusion in that the first two prongs of the custody modification test were met. However, the chancellor held that the third prong, that the modification of custody was in the best interests of the child, was not met. It is hard to imagine that leaving a child in a situation such as this is in the best interests of the child.
¶ 54. A.R.S.’s decisions and actions before and during the molestations were inappropriate and exemplified extremely poor parental judgment. A.R.S. allowed D.K.S. to accompany her in spending several nights in hotel rooms with Mr. Sorey, her male “friend.” A.R.S. allowed Mr. Sorey to spend several nights in their apartment while D.K.S. was present. Although the sleeping arrangements during these visits are unclear, all parties admit at one point or another that A.R.S. made no objections to D.K.S. lying in the same bed with Mr. Sorey. While-these actions might raise a morally inquisitive eyebrow, the fact that Mr. Sorey was regularly drinking alcohol at these times and A.R.S. allowed him to use the rest room while D.K.S. was bathing are shocking. Aso shocking is the fact that A.R.S. was asleep in the same room while D.K.S. was molested on three occasions. While A.R.S. cannot be blamed for the criminal acts of Mr. Sorey, the entire situation should have been avoided completely.
■¶ 55. A.R.S.’s decisions and actions after discovering the molestations were far from acceptable, and may be criminal. Citing her own medical procedures and difficulties as an excuse, A.R.S. did not bring D.K.S. to a doctor until a week after the molestation. There is no indication that A.R.S. notified the police or the DHS on her own accord. Rather, R.L.S. notified the proper authorities. In fact, A.R.S. made efforts to deter the police and DHS investigations and acted in a manner to conceal or protect Mr. Sorey. A.R.S. also made such efforts to keep the information a secret from R.L.S. Testimony from an expert witness confirmed that such actions of concealment had a negative effect on D.K.S., further harming the sexually abused and extremely confused child. Further, such acts of concealing a suspected felon during a criminal investigation might qualify as aiding and abetting. Our supreme court has established that:
Under [§ 97-1-5 Miss.Code Ann. (1972)] the state must prove (1) that a completed felony had been committed; (2) that the accused concealed, received, relieved, aided or assisted a felon, knowing that such person had committed a felony; and (3) that such aid or assistance was rendered with intent to enable such felon to escape or to avoid arrest, trial, *1262 conviction or punishment after the commission of such felony. The elements of the crime of accessory after the fact are succinctly stated in 21 Am. Jur.2d, Criminal Law s 126 as follows:
To be guilty as an accessory after the fact one must have known that a completed felony was committed and that the person aided was the guilty party and the person charged must have had an intention to shield the felon from the law.
Harris v. State, 290 So.2d 924, 926 (Miss.1974). Finally, A.R.S.’s testimony is not only riddled with contradictions, where she seems to change her own story several times, it is often contradictory to the testimony of D.K.S., which is supported by strikingly similar testimony offered by R.L.S. and Ms. Donald as well as the DHS record that was entered into evidence.
¶ 66. The incidents of sexual molestation that D.K.S. was subjected to under the supervision of her mother were not isolated incidents, such as the incident noted in Tucker. Rather, A.R.S. subjected D.K.S. to a dangerous environment on multiple occasions. Further, the material change in the overall living conditions which the chancellor found to be present is such that the change will likely remain in the foreseeable future. A.R.S. shows no responsibility for her inappropriate parental behavior, nor a propensity to change.
¶ 57. In conclusion, it is in the best interest of D.K.S. that R.L.S. gain custody. Since the divorce and initial custody hearing, R.L.S. has established a functional and happy family with a nice home to live in and a good job to support the family unit. This is a healthy environment for a child to be raised and is a substantial improvement in overall living condition and familial support for D.K.S. to enjoy. Further, the fact that D.K.S. trusted M.S., her step-mother, to such a degree that she discussed the molestations with her against A.R.S.’s command reveals a strong bond and trust between the child and her step-mother. R.L.S. and M.S. were the sanctuary that the child sought out and utilized in a time of great distress, while A.R.S. became part of the confusion and problem.
¶ 58. While the matter of A.R.S.’s visitation should be addressed on remand, the issue of custody is reversed and rendered in favor of R.L.S.
¶ 59. THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT IS REVERSED AND RENDERED AS TO THE CUSTODY OF THE CHILD AND REMANDED AS TO THE VISITATION SCHEDULE OF THE MOTHER. COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., PAYNE, BRIDGES, LEE, IRVING, MYERS and CHANDLER, JJ., concur.