944 So.2d 47 (2005)
Ginger M. McSWAIN (Hartfield), Appellant
v.
Charles C. McSWAIN, Appellee.
No. 2004-CA-00088-COA.
Court of Appeals of Mississippi.
November 8, 2005.
Rehearing Denied March 28, 2006.
*49 William E. Andrews, Purvis, attorney for appellant.
James R. Hayden, Hattiesburg, attorney for appellee.
Before KING, C.J., IRVING and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. The Chancery Court of Lamar County transferred custody of Charles Miller McSwain (Miller) from his mother, Ginger McSwain (Hartfield), to his father, Charles McSwain. The chancellor based his action on a finding that there were material changed circumstances, in that Ginger had become addicted to alcohol and drugs and had checked herself into a rehabilitation facility. The chancellor found that these circumstances had an adverse impact on Miller's welfare, thus necessitating the change of custody. Aggrieved by the chancellor's decision, Ginger appealed. We find that the chancellor manifestly erred by considering the potential for changed material circumstances, rather than whether changed material circumstances existed at the time of the hearing. Accordingly, we reverse and render.

FACTS AND PROCEDURAL HISTORY
¶ 2. Charles and Ginger McSwain were married on October 10, 1997, in Costa Rica, Central America. The marriage produced one child, Miller. On April 25, 2000, the parties filed a joint bill for divorce on the grounds of irreconcilable differences in the Chancery Court of Lamar County. On August 25, 2000, Charles and Ginger entered into a settlement agreement of child custody, support, and property distribution. Under the terms of the agreement, both parties retained legal custody of Miller, while physical custody, primary care, and control of Miller was placed in Ginger. Charles received reasonable visitation rights and agreed to pay monthly child support. On September 14, 2000, the chancellor approved the settlement agreement and entered a final judgment of divorce.
¶ 3. Some time later, on or about February 2001, Ginger married Joe Hartfield. Joe and Ginger have a child, Madison. Testimony at trial from both Ginger and Joe showed that this marriage was fraught with strife from the very beginning. The couple argued and fought, sometimes violently, and the arguments many times involved physical violence as *50 well.[1] Although both Ginger and Joe denied that Miller or Madison were ever harmed or were ever in danger of being harmed by the physical violence, they also testified that the children were often present and contemporaneously witnessed the fights. Joe testified that, very early into the marriage, he began to have thoughts of divorcing Ginger. He attributed Ginger's actions to alcoholism, which he believed existed before their marriage, and to the negative interaction of Ginger's alcohol consumption with her antidepressant medications. Ginger's unpredictable actions would sometimes rise to the level that Joe felt it was necessary to take Madison and, on one occasion, Miller, to the house of Joe's mother.
¶ 4. Although there is no specific time frame for the foregoing events, other than that they occurred between 2001 and 2002, Ginger's condition appears to have seriously deteriorated in July of 2002. Ginger testified that during the month of July she smoked crack cocaine with her neighbor, Ramona. She then smoked the drug two more times in the month of August. By September, Ginger was smoking crack with her neighbor on a regular basis, apparently to the extent of a $300 a week habit. Ginger testified that she took Miller with her to Ramona's house when she smoked crack, and that Miller would wait in another room while she and Ramona smoked crack in the bathroom.
¶ 5. This drug use brought Ginger's condition to a desperate point, and on September 24, 2002, she voluntarily[2] checked herself into the Jolimar Summit Wellness Institute for drug and alcohol rehabilitation. Ginger voluntarily transferred custody of Miller to Charles for the duration of her stay at Jolimar. She completed the primary care program at Jolimar on October 22, 2002, and then completed an aftercare program on November 22, 2002.
¶ 6. On November 5, 2002, Charles filed a petition for modification of custody of Miller in Lamar County Chancery Court. The same day, the court held an emergency hearing without notice and issued an ex parte emergency temporary order which transferred temporary physical custody of Miller to Charles. Ginger promptly answered with a motion filed on November 13, 2002, to set aside or modify the temporary order. In response, the chancellor modified the temporary order to allow Ginger weekend visitation for the weekend of November 15-17, 2002. The court then approved an agreed order on December 10, 2002, which gave Ginger custody of Miller at random times throughout the month of December and up until January 8, 2003. Finally, the court entered yet another modification on January 31, 2003, which gave the parties alternating custody of Miller up until the time of trial. Trial on the issue of a permanent custody modification was set for March 12, 2003. However, due to the failure of a subpoenaed *51 witness to appear, the trial was postponed. The chancellor issued a temporary order on March 14, 2003, which gave the parties alternate custody of Miller on a weekly basis up until the time of trial.
¶ 7. Following a hearing on the merits, the chancellor issued a judgment on September 16, 2003, which permanently transferred custody of Miller to Charles. In support of his decision, the chancellor found that Ginger is a drug and alcohol addict who has suffered from suicidal tendencies,[3] depression, and other symptoms that accompany addiction. However, he did note that Ginger admitted herself to Jolimar, and that her counselor testified that she was released with a good prognosis, and that there was no reason to believe, at the time of the hearing, that Ginger had relapsed into her former addictions. Nevertheless, the chancellor found that Ginger was not participating in a recommended aftercare program, that Ginger was still associating with her former drug partner, Ramona, that Ginger was taking antidepressants and was anxious at times, and that marital discord persisted between Ginger and Joe.
¶ 8. At the same time, the chancellor found that Miller's father, Charles, had remarried and currently had a more stable home life. The chancellor acknowledged, however, that Charles was currently on his fourth marriage, and that he uses alcohol on a regular basis.
¶ 9. Based on these findings, the chancellor determined that Ginger's drug and alcohol addiction was a material changed circumstance which had an adverse impact on Miller in that the addiction "forc[ed] at least a temporary change in Miller's custody, the absence of Ginger being detrimental to Miller. . . ." The court determined the question then to be whether this changed circumstance "continues to be material and detrimental, or whether it is in the best interest and welfare of Miller for custody to remain with Charles." In order to determine whether Ginger had regained her stability and suitability for permanent custody, the chancellor looked to the Albright factors. Under the chancellor's analysis, the Albright scale tipped in Charles' favor. The chancellor ruled that the parties should maintain the current joint custody agreement through January 1, 2004, and then permanent custody would be transferred to Charles, with Ginger having "every reasonable visitation" including every other weekend, spring break week, and "extended visitation for the full Summer."

STANDARD OF REVIEW
¶ 10. Determinations of custody are within the sound discretion of the chancellor. Sturgis v. Sturgis, 792 So.2d 1020, 1023 (¶ 12) (Miss.Ct.App.2001). Findings of the chancellor will be upheld if they are based on substantial evidence, and we will not overturn a chancellor's findings unless they are clearly erroneous, exhibit manifest error, or are based upon an improper legal standard. Mosley v. Atterberry, 819 So.2d 1268, 1272 (¶ 16) (Miss. 2002); Cooper v. Ingram, 814 So.2d 166, 167 (¶ 2) (Miss.Ct.App.2002).

ANALYSIS
¶ 11. Ginger raises several issues on appeal, but we focus our analysis on *52 whether the chancellor properly found that there was an existing material change in circumstances at the time of trial. Ginger argues that the chancellor erred because, instead of determining whether there was a material change in circumstances, he merely re-weighed the Albright factors. Charles counters that the chancellor considered all of the relevant circumstances, and that his decision is therefore in the best interests of the child. Under the unique circumstances presented here, we find that the chancellor manifestly erred in altering the custody of Miller.
¶ 12. The burden of proof in a child custody modification is on the non-custodial parent. Mabus v. Mabus, 847 So.2d 815, 818 (¶ 8) (Miss.2003). The movant, by a preponderance of the evidence, must satisfy a three part test: "(1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody." Id. The court is not to use the modification hearing as an excuse to simply re-weigh the Albright factors to determine which parent is better suited at the present time for custody. Sanford v. Arinder, 800 So.2d 1267, 1272 (¶ 16) (Miss.Ct. App.2001). Rather, a child custody change can only be justified if parental behavior that poses a clear danger to the child's mental or emotional health is present. Morrow v. Morrow, 591 So.2d 829, 833 (Miss.1991). A mere isolated incident will not justify a change of custody, the chancellor must consider the totality of the circumstances. Tucker v. Tucker, 453 So.2d 1294, 1297 (Miss.1984). This means that "the chancellor should find that the overall circumstances in which a child lives have materially changed and are likely to remain materially changed for the foreseeable future." Id. (emphasis added). The chancellor's decision should be based on the conditions existing up to and through the trial on the matter. Id. The court must always consider the "totality of the circumstances" affecting the child, and that the "polestar consideration" in determining custody is the best interest and welfare of the child. Sanford, 800 So.2d at 1272 (¶ 15).
¶ 13. We find that the chancellor abused his discretion in transferring custody of Miller from Ginger because he improperly focused on the potential for future problems rather than the presently-existing circumstances of Miller's home life. The chancellor found that Miller's future would be dependent on his mother's ability to refrain from debilitating conduct in the future, and then ruled that this possibility of future debilitating conduct on the part of Ginger required a change of custody. We simply cannot agree. The evidence showed clearly that, at the time of the hearing, Ginger was free of alcohol and drug use, and her counselor at Jolimar testified that there was no reason to suspect that she had relapsed or that she would relapse in the future. Although the chancellor held that Ginger would have to adopt "a modified lifestyle" to avoid future relapses into drug and alcohol use, this finding does not establish that there is an existing change in circumstances when the evidence at trial showed that Ginger has indeed modified her lifestyle accordingly. The only finding the chancellor offered that regarded contemporaneous changed circumstances were the facts that Ginger and Joe continued to fight, and that Ginger still associated with her former drug partner. While these actions can certainly be viewed as warning signs that future detrimental conduct may occur, they are not of themselves conclusive evidence of a currently existing adverse environment that would mandate a change of custody.
*53 ¶ 14. Furthermore, the chancellor's reasoning is undermined by his decision to maintain the existing alternating custody agreement for approximately four months after his judgment was rendered. If, at the time of trial, Ginger's home was truly the situs of material changed circumstances which were detrimental to Miller, the chancellor's decision to maintain the alternating custody agreement for an additional four months would certainly magnify any harm to Miller. It is clear, then, that the chancellor's decision was based not on presently existing circumstances, but either as a punishment for Ginger's past improvident conduct, or as a preemptive sanction against Ginger's potential future actions. We hold that this is a misapplication of the standard for modifying child custody, which requires a manifest and ongoing change in circumstances. A chancellor may not modify custody based on his best guess of whether there will be a material changed circumstance in the future.
¶ 15. We are mindful of the chancellor's concern that Ginger did not complete a recommended secondary aftercare program, that she continues to associate with her former drug partner, that she continues to fight with her husband Joe, and that she currently takes prescription anti-depressant medications. However, counter testimony was also presented that the secondary aftercare program was purely voluntary, and that Ginger had already completed a primary aftercare program; that Ginger's association with Ramona includes Bible studies; and that Ginger's fights with her husband are now only verbal, not physical, and have decreased in intensity. Although Ginger discontinued her Alcoholics Anonymous meetings, she testified at trial that she did so because she was receiving sufficient support from her family and church. There was absolutely no evidence presented at trial that she was using alcohol or drugs at the time of the hearing or had done so at any time following her treatment at Jolimar. In fact, Ginger submitted negative drug tests for the months following her release from Jolimar up until the time of trial. It appears, therefore, that the chancellor mistakenly used past misconduct on Ginger's part to trigger a re-weighing of the Albright factors. This is an act which the chancellor may not perform absent an established and ongoing change in circumstances. Sanford, 800 So.2d at 1272 (¶ 16).
¶ 16. Mississippi law has, however, recognized that a chancellor need not follow the rigid test of finding a material change in circumstances when:
the existing custodial arrangement has shown itself to be actually detrimental to the child's well-being and the non-custodial parent can, by virtue of subsequent improvement in that parent's overall situation, demonstrate that he or she offers an alternative custodial arrangement beneficial to the child that did not exist at the time the original custody determination was made.
Hoggatt v. Hoggatt, 796 So.2d 273, 275 (¶ 9) (Miss.Ct.App.2001). This is the holding of Riley v. Doerner, 677 So.2d 740 (Miss.1996), where the Mississippi Supreme Court loosened the formalistic approach to child custody changes in certain unique circumstances. The court in Riley held that, in circumstances where an adverse affect on the child had been shown, or presumed under extreme circumstances, there was no need to make a showing of a materially changed conditions. Riley involved a custodial mother who was employed only sporadically, had no regular source of income, had numerous affairs prior to and following her second marriage, and smoked marijuana. Id. at 742. Following a custody hearing brought by the non-custodial father, the lower court ruled that custody should remain *54 with the mother because, despite the fact that adverse circumstances existed, these circumstances existed when the original determination of custody was made. Id. Thus, the chancellor found that there had not been a material change in circumstances. Id. The chancellor also found that there was no evidence that the harmful circumstances were actually having an adverse affect on the child. Id. On appeal, the Mississippi Supreme Court reversed, finding that the chancellor "is never obliged to ignore a child's best interest in weighing a custody change; in fact, a chancellor is bound to consider the child's best interest above all else." Id. at 745. The court found that when:
the environment provided by the custodial parent is found to be adverse to the child's best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly.
Id. at 744. The court also held that "[e]vidence that the home of the custodial parent is the site of dangerous and illegal behavior, such as drug use, may be sufficient to justify a modification of custody, even without a specific finding that such environment has adversely affected the child's welfare." Id.
¶ 17. We find that the instant case is distinguishable from Riley. Although the evidence did show that Ginger's home was the situs of marital discord with her current husband, and that Ginger did use alcohol in her home, these actions did not rise to the level of "dangerous and illegal behavior." More importantly, the testimony of Ginger and her husband Joe was that all traces of alcohol had been removed from the house at the time of trial, and that the marital discord between the two, while still present, was not as fierce and contentious as it previously had been. Thus, the circumstances which may have existed during July, August, and September of 2002 had subsided by the time Ginger finished her program at Jolimar and at the time of trial. While it is true that Ginger did take Miller with her to the house where she smoked crack cocaine, the evidence established that Ginger was, at the time of the hearing, rehabilitated from her drug use and that there was no reason to believe that she would relapse. Although Ginger still associated with her former drug partner, in whose home she smoked the crack, Ginger testified that their association had devolved into a Bible study, and that Ginger was involved in a church support group. In contrast, the custodial parent in Riley did not claim to have quit her occasional marijuana use, and, when the chancellor in that case ordered a drug test prior to issuance of his final judgment, the mother failed the test. In the instant case, Ginger claims to have stopped her drug use and to be rehabilitated, and her claims are supported by the testimony of her counselor. It is true that the chancellor found that Charles had improved his situation and was able to provide a better environment for Miller, but even giving the chancellor's findings full deference, this finding alone is insufficient to warrant a change of custody.
¶ 18. Most importantly, we again note that the chancellor's finding that Miller was adversely affected by the circumstances of his home environment seems to be contradicted by the chancellor's own determination of custody. The chancellor, in his order dated September 16, 2003, transferred permanent custody of Miller to his father Charles, he nevertheless directed that the joint custody agreement then in effect should continue up until January 1, 2004. This means that, even following the chancellor's determination of custody, *55 Ginger retained custody of Miller for approximately six weeks before permanent custody was transferred to Charles. We do not believe that the chancellor would have allowed Miller to remain in an existing home environment that was truly detrimental for this additional period of four months. We think a more accurate reflection of the chancellor's decision is that, because the evidence showed that Ginger was no longer using drugs or alcohol, and Miller's home situation had improved, the chancellor felt that the conditions would not be harmful to Miller in the four months before the permanent custody change took effect or during the extensive visitation allowed Ginger thereafter. The chancellor emphasized that Miller's best interest would only be served if Ginger could refrain from the conduct "which exacerbates her addictions." Therefore, the real issue for the chancellor was not whether there was currently a detrimental environment for Miller, but rather whether Ginger would relapse into her addictions.[4] The chancellor was certainly allowed to consider Ginger's likelihood of relapse in determining the "totality of the circumstances," but we find that this was actually the crux of his entire ruling. Since the possibility of relapse was not a material changed circumstance, we find that the chancellor manifestly erred in making his determination of custody on this basis. The effect of the chancellor's ruling was to punish Ginger for the limited incidents of cocaine use which occurred in July, August, and September of 2002. This is an insufficient basis for a change of custody absent an adverse affect on the child. See Kavanaugh v. Carraway, 435 So.2d 697, 700 (Miss.1983) (holding that an isolated instance of adultery committed by a custodial mother is insufficient to justify a change of custody if no resulting adverse affect on the child is shown). Adverse affect on the child may be presumed in certain instances, see Riley, but those circumstances are not present here. In fact, the chancellor found that the detrimental effect on Miller was Ginger's absence from his life during her time in rehabilitation.
¶ 19. Initial custody arrangements are not to be lightly overturned. A change of custody is a "jolting traumatic experience. It is only that behavior of a parent which clearly posits or causes danger to the mental or emotional well-being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody." Tucker, 453 So.2d at 1297 (quoting Ballard v. Ballard, 434 So.2d 1357, 1360 (Miss.1983)). The chancellor manifestly erred by changing custody of Miller based on the potential for a future material change in circumstances. We share the chancellor's concerns, however, regarding Miller's welfare in the event Ginger relapses into drug use. Charles would, of course, be free to petition the chancery court for immediate modification of custody should such relapse occur, and we are confident that the chancery court would rule appropriately. Custody of Miller is hereby reinstated in Ginger pursuant to this opinion.
¶ 20. THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE, P.J., BRIDGES, IRVING AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH A *56 SEPARATE WRITTEN OPINION JOINED BY MYERS, P.J, AND CHANDLER, J.
GRIFFIS, J., dissenting.
¶ 21. I respectfully dissent from the majority's decision to reverse and render.
¶ 22. As the majority states, custody determinations are within the discretion of the chancellor. Sturgis, 792 So.2d at 1023 (¶ 12). Indeed, chancellors are vested with broad discretion, and this Court will not disturb the chancellor's findings unless the court was manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard. Andrews v. Williams, 723 So.2d 1175, 1177 (¶ 7) (Miss. Ct.App.1998) (citing Sandlin v. Sandlin, 699 So.2d 1198, 1203 (Miss.1997)). Here, based on the evidence presented, I cannot find that the chancellor was manifestly wrong, abused its discretion, or applied an erroneous legal standard. Glass v. Glass, 726 So.2d 1281, 1284 (¶ 11) (Miss.Ct.App. 1998).
MYERS, P.J., AND CHANDLER, J., JOIN THIS SEPARATE OPINION.
NOTES
[1] The physical violence that occurred in some of these confrontations cannot be underestimated. Joe testified that on one occasion, Ginger ripped his shirt off. On another, Ginger drew a knife on Joe. On another, Ginger threw a laptop computer into the windshield of Joe's car. The children witnessed many of these fights and were visibly disturbed by what they saw. The domestic violence rose to such a level that the police had to be called on at least one occasion.
[2] There was some conflict at trial as to whether Ginger voluntarily checked herself in, or whether she did so in response to threats of divorce from her current husband, Joe Hartfield. It is undisputed that Joe Hartfield had threatened Ginger with divorce at times in the past due to her substance abuse. However, the evidence at trial suggested that Ginger's immediate decision to check into rehab was a voluntary one; the chancellor made no specific finding in this regard.
[3] We believe that the evidence adduced at trial simply did not support the chancellor's finding that the Jolimar records show that Ginger suffered from suicidal tendencies. When Ginger was initially admitted to Jolimar, she indicated on an entrance form that she had at some point had thoughts of suicide. However, when she was later interviewed by counselors regarding thoughts of suicide, it became clear that she had never taken those thoughts seriously or considered acting on them.
[4] Implicit in the chancellor's holding is his belief that Ginger will likely relapse into her addictions.