434 So.2d 1357 (1983)
Retha Lynn Pope BALLARD
v.
Tony Leon BALLARD.
No. 54312.
Supreme Court of Mississippi.
July 27, 1983.
Lawrence Chandler, Calhoun City, for appellant.
Thomas J. Richardson, Jackson, for appellee.
Before PATTERSON, C.J., and HAWKINS and PRATHER, JJ.
HAWKINS, Justice, for the Court:
Retha Lynn Pope Ballard appeals from a final decree of the Chancery Court of the First Judicial District of Hinds County changing custody of the minor son born unto her marriage with Tony Leon Ballard from her to the father.
The only issue we address on this appeal is whether there had been a sufficient change of circumstances following a divorce decree in which the custody of the child had been awarded to the mother to justify modification of the decree so that the father was given custody. The chancellor found there had been. Since we find he erred in his interpretation of the law, and was manifestly wrong, we reverse and render.

FACTS
Retha Lynn Pope Ballard and Tony Leon Ballard were married May 8, 1971. One child, Mark Jason Ballard, was born of this marriage on August 28, 1972.
Following an uncontested divorce proceeding, the Chancery Court of the First Judicial District of Hinds County entered a final decree granting the parties a divorce, and awarding control and custody of Mark *1358 to his mother Retha. The decree approved an agreement between Retha and Tony, dated June 16, 1977, in which Retha was to have custody of Mark, with Tony given all reasonable visitation, the right to have Mark on two week-ends every month, alternate recognized holidays on alternate years, and two weeks in the summer.
On January 16, 1978, Retha filed a petition to cite Tony for contempt for failure to pay on a car note. On May 3, 1979, Tony petitioned the court for modification of the decree to reduce child support payments, and give him two additional weeks in the summer, to which Retha filed a cross-bill.
On March 2, 1982, Tony filed a petition to modify the divorce decree, claiming generally that Retha "is no longer the most fit, proper and suitable party to have the permanent custody and control" of the child. It also contended the child had grown older and "will benefit greatly from the male guidance and leadership" that Tony could provide. There were no specific allegations of misconduct by Retha. Retha answered and cross-claimed.
Following the original divorce, Retha was employed in a hospital and lived for a time in an apartment complex in Jackson. Thereafter she moved to Calhoun City to a duplex, where she and Mark lived. She enrolled as a part-time student at the University of Mississippi and was employed as a laboratory technician in the Webster County General Hospital in Eupora. Tony, a native of Attala County, returned to live with his mother in a mobile home eleven miles from Kosciusko. His mother, Mrs. Loraine Ballard, was 61 years of age at the time of the hearing on June 28, 1982. Tony was employed as a bail bondsman and did some investigative work. His employment required him to be out at all hours of the night.
Retha went to school three days a week, from 9:00 a.m. to 2:00 p.m. The driving time from Calhoun City to the University is approximately one hour. She also worked two days a week from 7:30 a.m. to 5:00 p.m. The driving time from Calhoun City to Eupora is approximately forty minutes. Retha was one year from a degree in business administration. She also worked on a number of week-ends at the hospital.
Mark, almost nine at the time of the hearing, was a student in the Calhoun City public schools. He was a serious student and made better than average grades. Retha took him to church regularly, and helped him with his homework. Retha would return home each day approximately an hour after Mark got home. In that interim, a lady who lived next door in the other duplex, and who did not work, would keep check on Mark, seeing if he was in the duplex watching television, or outside playing with his dog or riding his bicycle.
Retha testified she planned everything she did around Mark, trying to make the time she did have with him as valuable as she could for him. She participated in the "kiddy leagues", and if she could not go, she arranged for another parent to take him.
She said Mark loved his father and she did everything possible to keep that relationship intact, never criticizing Tony before Mark.
Mary Knight, the mother of two sons, one of them Mark's age, testified she and Retha at times baby sat for the other, Mark had spent the night at her home, and played with her children. According to Mrs. Knight, Mark was a well-behaved and well-rounded child, who got along with her children "wonderfully". He was polite and had good table manners and always said his prayers before going to bed at night. Her observation was that Retha's life revolved around Mark. Retha never raised her voice to him, she took him to church and always knew where he was.
Mrs. Susie Aycock, who was a neighbor of Retha's in Jackson and worked with her, corroborated Mrs. Knight as to Retha's care and attention to Mark. She recalled Retha being unhappy with Mark's schooling in a public school, and getting him into a private school. She had observed Retha helping Mark with his homework.
Mrs. Linda Shelley, Retha's sister, also testified as to the devotion she had observed in Retha for Mark.
*1359 After moving to Calhoun City, Retha developed a romantic attachment to one Denis Young. They became engaged in January 1982. Tony, with the assistance of an off-duty Starkville policeman, began surveilling Retha's home. On two occasions from February 22 to March 27, 1982, Young was observed leaving the duplex around daylight. On another occasion Tony testified he went to the duplex at 7:30 a.m. and observed Young lying on the living room couch in pajama bottoms. Young and Retha claimed it was 8:30 a.m. when Tony observed Young, and he was either dressed in blue jeans or jogging pants.
Tony also observed two men leaving Retha's Jackson apartment at two a.m., and one time noticed marijuana in Retha's Jackson apartment.
Young at one time was employed by a bank in Starkville. He was convicted of possessing cocaine, and left his job with the bank. Thereafter he moved to Louisville, and was employed as a supervisor in the shipping department of a manufacturing plant. He met Retha in 1981. Young and Retha both testified Young had spent the night in Retha's home in Calhoun City on three occasions when Mark was there, but that he slept, fully dressed, on the couch in the living room. No improprieties were engaged in by them in Mark's presence at any time.
Young testified he would spend the night "all the time" when Mark was not there. Louisville and Calhoun City are approximately 55 miles distance from each other.
Young had over four years college work, and lacked eighteen hours receiving a degree in marketing.
Young, who was called as a witness by Tony, testified Retha was an attentive and devoted mother, taking Mark to church, tucking him in the bed at night, and he had noticed Mark having trouble with his math and Retha assisting him. Mark and Retha were very close, according to Young, and the three of them went together on camping, fishing and cook-outs. Retha worked very hard to get Mark on the baseball team he wanted to play on. She would carry ingredients for the team to have a cook-out and social after the game.
Retha testified she did not want to marry until she got her degree. She testified of the three times Young had spent the night in her home in Calhoun City, one time she was frightened because of some threatening telephone calls, another time Young's car battery was dead, and the third time she did not remember the reason.
As to the two men being in her apartment in Jackson, Retha testified she had been to a going away party for a fellow employee. The two men, who lived close by her apartment, stopped by on their way home. Tony called at 10:30 that night wanting to see Mark, and came over, banging on the apartment door. She would not let him in, and these two men stayed until the trouble subsided. They left around two in the morning.
As to the marijuana, Retha testified she had never smoked marijuana, but that she did have a room-mate in the Jackson apartment for two weeks who had smoked the marijuana. Tony was told by the room-mate that the marijuana had been hers, not Retha's.
As in most custody proceedings there was testimony by Retha as well as to Tony's behavior, but this evidence is not material to our decision.
Following the hearing, the chancellor made the following ruling:
The situation in this particular case is not unlike situations that we find in this Court almost on a regular basis. The question is not whether or not Mrs. Retha Ballard has been a good mother to her son, whether she has taken good care of him. That is not the problem at all. The Court is of the opinion that she has done a good job as far as watching after her son; that she has been attentive. There is no question but that she has, within her limits as far as her work and school is concerned, has spent a great deal of time with him. The problem is that she has allowed her boyfriend to spend the night in her apartment when her son was present. We just can't allow that. It is *1360 one of those situations that comes up and I am not accusing Mrs. Ballard of having sexual relations with Mr. Young or that she has done anything immoral. The fact is, he has slept in her apartment with her son present on admittedly three different occasions. As I understand the law, and I may be in error, that is a basis for taking custody away from her. I hate to do it because she has had primary custody since he was born, I am sure. What I am going to do is, I am going to shift custody to Mr. Ballard and give Mrs. Ballard the same visitation rights that Mr. Ballard had under the separation agreement. The only other thing I am going to do is this: I don't want Mr. Young in Mrs. Ballard's apartment until such time as they might marry even if it is just for a cook-out or for any occasion. I just don't believe a mother should be with her boyfriend in her child's company at all. I wouldn't really be so disturbed but the fact is not only has he been spending a great deal of time over there according to all the testimony for the last six months, but he has spent the night there when the son was present.

* * * * * *
The Court specifically finds that because Mrs. Retha Ballard has allowed her boyfriend to spend the night in her apartment when her son was present that she is unfit to have custody and that the best interest of the child would be to award custody to Mr. Ballard, who the Court believes to be fit and proper. (Emphasis added).

LAW
The record reveals that Mark Jason Ballard, the child involved in this needless and harmful child custody battle, was a well-behaved and well-adjusted child, of pleasant temperament, making good grades in school. The chancellor found the mother to be an attentive and devoted parent, as indeed he should, because the record fully supports this finding, and it is undisputed. The esteemed chancellor erred as a matter of law when he ruled that Retha's conduct, as shown in this record, constituted a legal basis for taking this child from her. See Cheek v. Ricker, 431 So.2d 1139 (Miss. 1983), wherein we affirmed a chancellor's refusal to modify a previous custody decree on behavior exceeding propriety's bounds which arguably was affecting the child.
Furthermore, it was manifest error to hold that the facts and circumstances of this case supported any modification of this child's custody. It must be recognized that uprooting a child from his mother, school, and environment was a jolting, traumatic experience. It is only that behavior of a parent which clearly posits or causes danger to the mental or emotional well-being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody. This case does not remotely reach any such proportion.
In Case v. Stolpe, 300 So.2d 802, 804 (Miss. 1974), we stated:
We have often held that it is not in the best interest of a small child to be shifted from parent to parent. Brocato v. Walker, 220 So.2d 340 (Miss. 1969); Kennedy v. Kennedy, 222 Miss. 469, 76 So.2d 375 (1954), overruled in part on other grounds, 222 Miss. 474, 76 So.2d 850 (1955).
For the reasons we have often stated, and most recently in Cheek v. Ricker, supra, divorced parents  and, if possible, assisted by level-headed, patient counsel  would do well to attempt in every way possible to amicably arrange for the care and control of their children, whom each parent loves dearly. Courts are ill-equipped to do what parents should be able to do.
REVERSED AND RENDERED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.