899 So.2d 904 (2005)
April Elaine DAVIDSON, Appellant,
v.
Edwin Daniel COIT, Appellee.
No. 2002-CA-01570-COA.
Court of Appeals of Mississippi.
February 1, 2005.
Rehearing Denied April 19, 2005.
*906 Sandra Nicole Farrell, attorney for appellant.
Christopher A. Tabb, Brandon, attorney for appellee.
Before LEE, P.J., IRVING and GRIFFIS, JJ.
GRIFFIS, J., for the Court.
¶ 1. April Elaine Davidson appeals the chancellor's judgment modifying custody. We find no error and affirm.

FACTS
¶ 2. Edwin Daniel Coit and April Elaine Davidson were married on July 27, 1991. Two children were born during their marriage, Marilyn Elaine Coit and Kathryn Elizabeth Coit. At the time of the hearing in this matter, Marilyn was nine years old and Kathryn was seven years old. On December 30, 1997, the Chancery Court of Rankin County entered a final judgment of divorce based on irreconcilable differences. In the judgment, Coit and Davidson agreed to share joint physical and legal custody of the children. The judgment provided that the children were to live primarily with Davidson, and Coit would have visitation rights.
¶ 3. On August 14, 2001, Coit filed a motion for modification of custody. The motion asserted two grounds for modification: (1) the minor children have been exposed to Davidson's lesbian lifestyle; and (2) Davidson's live-in girlfriends and mother were raising the children.
*907 ¶ 4. After a hearing, the chancellor entered a temporary order that removed the children from Davidson's home and placed them in Coit's custody. After additional hearings, the chancellor issued his findings of facts and conclusion of law that modified the judgment of divorce and granted Coit permanent custody of the children.
¶ 5. Davidson appeals and raises the following issues: (1) the chancellor committed manifest error in granting the modification since there was no substantial change in circumstances since the original custody decree was entered; (2) the chancellor erroneously applied the Albright factors and neglected to make sufficient findings to support his decision; and (3) the chancellor placed too much weight on one individual Albright factor, specifically the moral fitness of the parents.

STANDARD OF REVIEW
¶ 6. This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002).

ANALYSIS

I. Did the chancellor err by granting the motion for modification?

¶ 7. "In cases involving a request for modification of custody, the chancellor's duty is to determine if there has been a material change in the circumstances since the award of initial custody which has adversely affected the child and which, in the best interest of the child, requires a change in custody." Sanford v. Arinder, 800 So.2d 1267, 1271(¶ 15) (Miss.Ct.App. 2001). As such, the non-custodial parent must pass a three-part test: "a substantial change in circumstances of the custodial parent since the original custody decree, the substantial change's adverse impact on the welfare of the child, and the necessity of the custody modification for the best interest of the child." Id. at 1272(¶ 15) (quoting Brawley v. Brawley, 734 So.2d 237, 241(¶ 12) (Miss.Ct.App.1999)). This Court has routinely utilized this test in the area of child custody modifications. See Sanford, 800 So.2d at 1271(¶ 15); Thompson v. Thompson, 799 So.2d 919, 922(¶ 8) (Miss.Ct.App.2001); Brawley, 734 So.2d at 241(¶ 12). In order to clarify the type or magnitude of material changes that warrant a modification of custody, our supreme court explained that when the totality of the circumstances display a material change in the overall living conditions in which the child is found, which are likely to remain changed in the foreseeable future and such change adversely affects the child, a modification of custody is legally proper. Kavanaugh v. Carraway, 435 So.2d 697, 700 (Miss.1983).
¶ 8. In this issue, Davidson argues that Coit did not present sufficient evidence of the first part of the test  a substantial change in circumstances of the custodial parent since the original custody decree. Davidson claims that, at the time of the original divorce, both the court and Coit were aware that she was a lesbian and had a live-in girlfriend. Hence, Davidson reasons that the chancellor committed manifest error by granting the modification because a substantial change in circumstances has not occurred since the original custody decree was entered.
¶ 9. Davidson relies on the following language from Lambert v. Lambert, 872 So.2d 679, 684(¶ 21) (Miss.Ct.App.2003):
To permit a change in custody, there must first be a factual determination based on substantial evidence, presented by the petitioning party, that there has *908 been a substantial and material change in circumstances since the divorce was granted adversely affecting the child and which ... are anticipated to be permanent or continuing such that they would warrant a change in custody. These changed circumstances must be such that they could not be anticipated at the time of the initial determination of custody and of such magnitude as to justify the drastic measure of change in custody.
(Emphasis added in Davidson's brief).
¶ 10. Indeed, Davidson's sexual preference for women was known at the time of the divorce and initial custody determination. However, Coit's motion for modification was not based on the mere assertion that Davidson was a lesbian. Instead, Coit presented evidence that indicated there was a substantial change in circumstances that has occurred since the original custody determination through the children's exposure to her lesbian sexual relationship and that the exposure has adversely affected the children.
¶ 11. Paul Davey, a qualified expert in the area of adolescent, child and family therapy, testified that since the custody award, the children have admitted to him that most of their primary care is provided by Davidson's live-in girlfriend and that they have been exposed to their mother's sexual behavior. Davey testified to the following:
Q. And has [their] mother's living arrangements had any impact and does her current living arrangement have an impact on these two little girls?
A. It appears so, yes sir.
Q. Okay. Tell the Court how this is having an impact on the two little girls.
A. The most current sessions  and I'm going to jump ahead away from the '96 visits and come forward to the visits that actually began in 2000 and this year because I think there is a difference between those periods of time.
Beginning in 2000 and this year, Marilyn began telling me about her mother's current live-in relationship, someone she identified as Nikki and then later as Tina and it turns out that this is actually the same person.
She began to talk with me about her mom and Nikki sharing the bedroom and them watching movies together in the living room.
On the appointment of March 23rd of 2000, she told me her mom and Nikki watched movies in the living room, quote, "there are naked women on the t.v. kissing each other and lying next to each other like this" and then she demonstrated by acting affectionate kissing and then she said, "yuk".
The girls reported  and again, more so Marilyn than Katy, Marilyn being the older child  that most of their primary care was provided by Nikki, that she was the one who took care of them and at the most recent appointments  and I'm coming forward now to appointments in October of last year and May of this year  what Marilyn and Katy told me was that Nikki took most of the care of them, that their mother had to rest when she got home and that their mother didn't feel like doing a lot with them and, so, it was Nikki who actually provided the care for them and played with them and did things with them.
Katy specifically at the visit of October of last year said that "Nikki took care of us, cooks for us, cleans the house and takes us places and plays *909 with us. She fixes us breakfast and is good to us."
When asked about her mother, she said her mother didn't do too much, that she didn't feel good.
I asked her if that was true all of the time and she responded, "All the time."
I asked her if that was the case everyday and she responded, "Every day."
Q. Now, Mr. Davey, you have talked to the father. Do you think he is a fit person for custody of these two children?
A. Appears to be from my vantage point, yes, sir.
Q. And do you think  what is your opinion as to the present living arrangements with these two little girls living with their mother with the way that their mother is living?
A. They have had to make some adjustments because there has been more than one girlfriend who has been living in and Marilyn has gotten to the age where she has started to notice that her mother is sharing a bed with another woman and she is paying attention to that in a way that was different  that is different  from how she paid attention to it when she was younger.
When she was younger, it was something that was merely noticed and now there is more than just notice on Marilyn's part. She is paying attention to the fact that her mother is sharing the bed with another woman.
Q. Do you think that this activity of her mother's is detrimental in particular to Marilyn?
A. From the standpoint of her development, in my opinion, it appears to be so, yes, sir. She is noticing and paying attention to the fact that her mother is sharing a bed with another woman, she's  both of the girls have talked about the movies that their mother and her girlfriend watch with naked women rolling around together on the t.v.
Given the age of the girls particularly is not something that is not going to be particularly good for them mentally.
¶ 12. This Court has held that the sexual relations of an unmarried custodial parent cannot be the sole factor in determining custody. Forsythe v. Akers, 768 So.2d 943, 947(¶ 11) (Miss.Ct.App.2000). However, it can be one factor. Sullivan v. Stringer, 736 So.2d 514, 517-18(¶ 19) (Miss.Ct.App.1999). The existence of the relationship is insufficient, but if the relationship is coupled with other conduct that indicates the custodial parent's behavior is harmful in additional ways, custody can be changed. Id. at (¶ 20).
¶ 13. We often encounter similar accusations between heterosexual former spouses. One former spouse will claim that the other former spouse's sexual relationship with a person of the opposite sex should decide the issue of custody. In Ballard v. Ballard, 434 So.2d 1357, 1360 (Miss.1983), the supreme court determined that a custodial parent's sexual relationships will support a modification of custody only if such behavior "clearly posits or causes danger to the mental or emotional well-being of a child (whether such behavior is immoral or not)." The non-custodial parent's motion was based on the fact that the child's mother had allowed a man to spend three nights in her home. Id. The chancellor found no detrimental or adverse effect on the child, but determined that the mother's immoral conduct was sufficient to modify custody. Id. The supreme court reversed the chancellor and determined that a custody modification required a *910 finding of adverse impact on the welfare of the child. Id. Thus, immoral conduct alone is not sufficient as grounds for modification. Id.
In Cheek v. Ricker, 431 So.2d 1139, 1144-45 (Miss.1983), the supreme court held that "the mother's indiscretions with another man do not, in a divorce action, constitute a per se barrier to an award of child custody, it makes no sense that such a barrier should be erected in custody modification proceedings." In a footnote, the court ruled:
Our view of custody modifications articulated above is comparable to that employed in other states in similar fact situations. See, e.g., Roberson v. Roberson, 370 So.2d 1008, 1011 (Ala.Civ.App. 1979) ("a mother will not be denied custody for every act of indiscretion or immorality", especially where no detrimental effect on the welfare of the child has been shown); Rippon v. Rippon, 64 Ill.App.3d 465, 21 Ill.Dec. 135, 381 N.E.2d 70, 73 (1978) ("indulgence in moral indiscretions alone is not grounds for a change of custody where the children are leading a normal life").
Cheek, 431 So.2d at 1145 n. 4.
¶ 14. Davidson argues that the chancellor erred because "the facts presented simply do not support the finding of material change." We disagree. While it may have been known that Davidson was a lesbian, the substantial change in circumstances was the fact that Davidson exposed the children to the sexual nature of her relationships with other women. Indeed, there was sufficient evidence that Davidson exposed the children not only to her lesbian partners but to her sexual nature of her intimate relationships. The exposure was the substantial change in circumstances since the original custody decree. The fact that Coit and the court knew that Davidson was a lesbian did not give her permission to expose the children to any of her sexual relationships.
¶ 15. Further, there was also sufficient evidence for the chancellor to find that the exposure of the children to her sexual relationships adversely impacted the welfare of the children. Davey opined that the children's exposure to the sexual nature of Davidson's relationships with her live-in girlfriends was detrimental to the children's well being. There was sufficient evidence to support the chancellor's decision to modify custody. Accordingly, we do not believe that the chancellor committed manifest error in finding that the modification of custody was in the best interest of the children. We find no merit to this issue.

II. Did the chancellor erroneously apply the Albright factors?

¶ 16. Ms. Davidson next argues that the chancellor committed error in the application of the Albright factors and failed to make sufficient factual findings to support his decision.
¶ 17. In all child custody cases, the polestar consideration is the best interest of the child. Sellers v. Sellers, 638 So.2d 481, 485(¶ 4) (Miss.1994). In making a child custody determination, it is well settled law that the trial court is to consider several facts which include: the age of the children; the health and sex of the children; which parent had the continuity of care prior to the separation; which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parents and their responsibilities in that employment; the physical and mental health and age of the parents; emotional ties between parent and child; the moral fitness of the parents; the home, school and community record of the child; the preference of the child if of sufficient age; *911 the stability of the home environment and employment of each parent; and any other relevant factors. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).
¶ 18. It is true that a chancellor's failure to make specific findings as to each individual Albright factor is reversible error. Powell v. Ayars, 792 So.2d 240, 249(¶ 33) (Miss.2001). However, the chancellor addressed and analyzed each of the Albright factors in his detailed findings of facts and conclusion of law. The chancellor's findings on the Albright factors were consistent with the testimony presented. Since the chancellor found that none of the Albright factors favored Davidson, the chancellor was correct to grant custody to Coit. Therefore, we find no error in this issue.

III. Did the chancellor place undue weight on one individual Albright factor?

¶ 19. Davidson claims that the chancellor erred by placing too much weight on one individual Albright factor, mainly the moral fitness of the parents. Davidson contends that the chancellor placed improper weight upon the fact that she is a lesbian.
¶ 20. It is well settled that the court can consider a homosexual lifestyle as a factor relevant to the custody determination of the child, as long as it is not the sole factor. Morris v. Morris, 783 So.2d 681, 693(¶ 47) (Miss.2001). Although the morality of Davidson's lesbian lifestyle was one factor considered by the chancellor, it was not the sole factor. Davidson's sexuality was discussed often at the trial. As discussed above, however, the chancellor did not decide the modification simply because she had a sexual preference for women. Instead, among other factors, the exposure of the children to this sexual lifestyle and her intimate relationships weighed in the chancellor's decision.
¶ 21. The chancellor considered other aspects of Davidson's lifestyle and the manner in which she was rearing the children. The chancellor was disturbed by Davidson's lack of participation in the primary care and supervision of the children. He expressed concern that Davidson's live-in girlfriends seemed to spend more time taking care of the children than their own mother. He was also concerned that Davidson's employment interfered with and affected the amount of time she spends with the children.
¶ 22. Davidson also argues that the chancellor erroneously placed undue weight on church attendance. For over a century, our courts have considered a parent's involvement in the "moral and religious training" to determine custody. Randall v. Randall, 28 So. 19, 20 (Miss. 1900). More recently, the supreme court has affirmed that a chancellor may consider the issue of religion when determining custody. Weigand v. Houghton, 730 So.2d 581, 587(¶ 23) (Miss.1999). In Weigand, the chancellor considered the issue of religious training towards the development of a child. Id. The chancellor determined that the child's best interests would be served by attending church. Id. Because the mother took the child to church, the chancellor weighed the moral fitness factor heavily in her favor. Id. In this case, the record shows that Coit regularly takes the children to church. Thus, there was evidence to support the chancellor's decision to weigh the moral fitness factor in his favor.
¶ 23. The dissent argues that the chancellor violated Davidson's constitutional "right to freely exercise one's religion." This argument was rejected by the Mississippi Supreme Court in McLemore v. *912 McLemore, 762 So.2d 316, 319-20 (¶¶ 6-10) (Miss.2000).
¶ 24. The dissent is concerned that we may have misunderstood the McLemore decision. The issue in McLemore was identified as whether "[t]he court committed manifest error in ordering the defendant to attend church and to be responsible for the children's attendance at church." Id. at 319(¶ 6). The portion of the chancellor's order reviewed by the court read, "[b]oth parties shall assume responsibility for the attendance of the children in church each Sunday while in their respective custody." Id. (Emphasis in original). The supreme court did not reverse the chancellor's decision on this ground. Instead, the court affirmed the chancellor's order but modified the language of the order to read, "Both the mother and father should be vitally interested in seeing that their children get regular and systematic spiritual training. Whether it be by attending Sunday School each Sunday or Church is for the parents alone to decide." Id. at (¶ 8-10) citing Hodge v. Hodge, 188 So.2d 240 (Miss.1966). Similar language was not contained in the chancellor's order in this case.
¶ 25. Instead, the dissent bases its concern on a statement made by the chancellor on November 26, 2001. The chancellor heard testimony, in this case, on November 26, 2001, March 11, 2002 and June 3, 2002. The chancellor's findings of fact and conclusions of law included the following language about Davidson's moral character:
[Davidson] is lacking in some aspects of her character.
a. Lets others watch her children more than she does.
b. Never takes the children to church or any other moral character building programs.
c. April's mother has grave concerns about April's motherly instincts.
d. April's change of partners. It appears to be somewhat strange that April on the one hand feels that her alternative lifestyle is no one's business but her own. On the other hand if she were dating a male and bringing him into the home where two (2) impressionable girls live, you would raise everybody's eyebrows. It would appear to many that if her alternative lifestyle is viewed to be sexual in nature that it would be just as wrong for April to bring three (3) different women into her home as to bring three (3) different men.
¶ 26. The chancellor's order did not require either parent to take the children to church. Indeed, the chancellor's consideration of their church attendance was used in his determination of the Albright factors and his ultimate determination of the best interest of the children.
¶ 27. In Blevins v. Bardwell, 784 So.2d 166 (Miss.2001), the Mississippi Supreme Court once again approved a chancellor's consideration of religious training in child custody proceedings. In Blevins, the court explained that "future religious example" is not a factor listed in Albright, although it could theoretically fall within "other factors relevant to the parent-child relationship" or under "moral fitness of the parents" as found in Albright. Blevins, 784 So.2d at 175(¶ 34). Citing McLemore, the court found that the chancellor did not abuse her discretion when considering future religious example in the custody determination of the child. Id.
¶ 28. The dissent also argues that the chancellor placed undue weight on the question of religion. There was no error for the chancellor to consider a parent's involvement in the past and future religious *913 and spiritual development of their children. As discussed in detail above, the chancellor correctly considered the issue of religion along with several other legitimate reasons to weigh the moral fitness factor in favor of Coit and against Davidson.
¶ 29. Furthermore, the chancellor did not solely rely or place undue weight on Davidson's decision as to whether to engage in religious activities. The chancellor's findings of facts and conclusions of law indicates that he found five of the Albright factors to favor Coit: best parenting skills and willingness and capacity to provide primary child care; the employment of the parents and their responsibilities in that employment; the moral fitness of the parents; the stability of the home environment and the best interest and welfare of the children. The chancellor found none of the Albright factors to favor Davidson. Even if we determined that the chancellor was incorrect in assessing the moral fitness factor in favor of Coit, there remains substantial evidence to support the chancellor's findings on the remaining Albright factors. Even the dissent concedes that the chancellor did not commit reversible error. We affirm this case because there was substantial evidence to support the chancellor's polestar determination that the best interest of the children requires that custody be granted to Coit. For these reasons, we find no merit in this issue.
¶ 30. THE JUDGMENT OF THE RANKIN COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, BARNES AND ISHEE, JJ. CONCUR. KING, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.
KING, C.J., Dissenting:
¶ 31. With appropriate respect for the majority opinion, I dissent as to issue III.
¶ 32. Davidson states the relevant portion of her issue III as, "The Chancellor Erroneously Placed Undue Weight on Church Attendance as a Part of The Moral Fitness Factor, and Violated the United States and Mississippi Constitutions by Admonishing the Parents to Take the Children to Church."
¶ 33. Davidson suggests that the chancellor placed undue weight on church attendance. My reading of the record leads me to reluctantly conclude that Davidson is right.
¶ 34. Moral fitness of the parents is merely one of several factors which may be considered in deciding issues of child custody, it should not be weighed disproportionately. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). The question of a parent's moral fitness addresses his /her core values, his/her standards of right and wrong, and the rules by which he/she lives. Religious training and moral fitness are not synonymous. In re Guardianship of Faust, 239 Miss. 299, 306, 123 So.2d 218, 220 (Miss.1960). Religious training is merely one item which can reflect on moral fitness, but it is not the sole determinant of moral fitness. In this case, the chancellor appears to have equated church attendance (religious training) with moral fitness, and in so doing, placed undue weight on that single issue.
¶ 35. At the close of the November 26, 2001 hearing, the chancellor ordered that the children be taken to church, saying "I want the children in church wherever they may be." This statement is significantly more than a mere suggestion or mere encouragement *914 to take the children to church. It is a direct command that Davidson place the children in religious activities.
¶ 36. When the parties returned to court on March 11, 2002, one of the reasons given for being back in court was Coit's concern that Davidson had not followed the court's order to have the children in church. During that hearing, the chancellor expressed concern and disbelief that Davidson was not affiliated with a church, as shown by the following questions:
The Court: What church do you go to?
Ms. Coit: Well, I took them  when I went to Atlanta I took them to a Baptist church over there and I have not found a church here in Jackson at all, so 
The Court: And how long have you been here, in Jackson?
Ms Coit: Well, I've been living here for maybe  I've been living here for six years and 
The Court: You've spent six years and you haven't found a church that you like yet in six years?
¶ 37. When the parties returned to court on June 3, 2002, the chancellor again inquired as to whether Davidson was taking the children to church. The chancellor asked Davidson, "Ma'am, do you take the children to church with you?" This question would seem to suggest that not only does the chancellor think the children should be in church, he thinks that they should be in church with their mother.
¶ 38. The right to freely exercise one's religion also includes the right not to exercise a religion. U.S. Const. amend. I., Gunter v. Gray, 876 So.2d 315(¶ 2) (Miss. 2004).
¶ 39. The decision to engage or not engage in religious activities is without question an item which may be considered when reviewing the moral fitness of competing parents. Blevins v. Bardwell, 784 So.2d 166(¶ 34) (Miss.2001). But that decision by itself, does not make an individual moral or immoral. Likewise, that decision does not conclusively resolve the question of moral fitness.
¶ 40. None of the Albright factors should be accorded undue weight in resolving the question of child custody. Albright, 437 So.2d at 1005. Because I believe that the chancellor equated religion with moral fitness, and placed undue weight on the issue of religion, I would reverse and remand for trial before a different chancellor.
¶ 41. The majority seeks to bolster its opinion by citation to the McLemore case. However, the majority appears to have misunderstood the McLemore case. The issue decided in McLemore was whether, "The court committed manifest error in ordering the defendant to attend church and to be responsible for the children's attendance at church." In its response to this dissent, the majority cites to paragraphs 6 and 7 of McLemore. I think it appropriate that the substance of those paragraphs be made a part of this opinion to provide some context to what is said. Paragraphs 6 and 7 of McLemore read as follows:
Anita misinterprets the court's order. She was not ordered to attend church. The court's order pertained only to the children, stating that "[b]oth parties shall assume responsibility for the attendance of the children in church each Sunday while in their respective custody." (emphasis added). Anita asserts that this court order violates the First Amendment establishment and free exercise clauses of the U.S. Constitution as well as the Fourteenth Amendment, arguing that the court order constitutes government establishment of the Christian *915 religion. She alleges that the word "church" used in conjunction with a specific day, Sunday, implicates a particular religion, Christianity. THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1981) defines "church" as a "place of worship, a congregation". It is not a foregone conclusion that such could only refer to a particular religion, sect, or denomination. The chancellor did not specify a particular faith. There was no discrimination or preference shown. The chancellor's order that the children attend church inherently provided for choice. One need only glance through the yellow pages for the vicinity in which Anita and Carl live to appreciate the diverse meaning of the word "church". This is simply a succinct term employed by the chancellor to describe a benefit that he determined to be in the best interest of the children. The polestar consideration in child custody cases is the best interest and welfare of the child. Albright v. Albright, 437 So.2d, 1003, 1005 (Miss. 1983).
Anita asserts that the court order violates her constitutional right not to practice organized religion. While the order for the children to attend "church" might somehow inhibit her ability to be completely free from any effect that "church" might have on her, the order was reasonably based upon serving the best interests of the children. The chancellor, familiar with the churches in the community, was doubtless aware of the myriad of programs offered for enrichment of children's lives. The range is great. Churches are traditionally places of calm and concern. At virtually no expense to parents, churches offer children the opportunity for interaction with groups of other children as well as adults, in an environment conducive to character-building.
McLemore v. McLemore, 762 So.2d 316 (¶¶ 6,7) (Miss.2000).
¶ 42. Likewise relevant are paragraphs 10 and 11, which read:
To follow the precedent established in Hodge, we modify the provision regarding the McLemore twins' church attendance set forth in the Final Judgment of Divorce in the present case, to read as follows: Both the mother and father should be vitally interested in seeing that their children get regular and systematic spiritual training. Whether it be by attending Sunday School each Sunday or Church or both is for the parents alone to decide.
The trial court's judgment on this issue is affirmed as thus modified.
Id. at (¶¶ 10,11) (emphasis added).
¶ 43. As can be seen from the emphasized sentence in paragraph 10, the supreme court encouraged spiritual training, but noted that the decision was one to be made solely by the parents. The reasons given for the encouragement of spiritual training were, "The chancellor, familiar with the churches in the community, was doubtless aware of the myriad of programs offered for enrichment of children's lives. The range is great. Churches are traditionally places of calm and concern. At virtually no expense to parents, churches offer children the opportunity for interaction with groups of other children as well as adults, in an environment conducive to character-building." Id. at (¶ 7).
¶ 44. This case was tried by the same chancellor, who tried McLemore. McLemore was decided on June 29, 2000. Proceedings in this case were had on November 26, 2001, March 11, 2002, and June 3, 2002. When these proceedings occurred, the McLemore decision had been released long enough that the chancellor was aware of it, and could have specifically followed it.
*916 ¶ 45. The issue of undue weight is a fact driven question, dependant upon the specific facts of each case. When the record of this case is considered in its entirety, the facts suggest that the chancellor did in fact place undue weight on the question of religion. By placing undue weight on the question of religion, the chancellor committed error.
¶ 46. The majority says there were sufficient other negative matters, which justified the chancellor's change of custody. That may well be true. But a reading of the record in its entirety still suggests that the chancellor placed undue weight on the issue of church attendance, and by doing so, on the moral fitness factor. It is therefore error. It may well be harmless error, but it is still error. Bower v. Bower, 758 So.2d 405(¶ 38) (Miss.2000).