ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. This is an appeal from the Rankin County Chancery Court. The issue on appeal is whether the chancellor erred in finding a material change in circumstances that adversely affected the children and by changing custody from the father to the mother. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Jonathan Self and Elizabeth Lewis were married on September 18, 1999. Two children were born from the marriage: Brooklyn, whose birthday is July 18, 2001, and Emily, whose birthday is February 18, 2003. The couple separated on July 12, 2006, and on July 18, 2006, Jonathan filed for divorce on the ground of adultery. Elizabeth filed a counterclaim for divorce a few days later.
 

 ¶ 3. Jonathan and Elizabeth agreed to withdraw all grounds for divorce and requested a divorce based on irreconcilable differences. The chancellor granted the divorce. Jonathan and Elizabeth executed a “Marital Dissolution Agreement” (“the Agreement”), which provided for the division of their property and the custody of the children. The chancellor accepted the Agreement and made it a part of the judgment of divorce. In the Agreement, Jonathan and Elizabeth agreed to share joint legal custody of the children, and Jonathan was granted full physical custody. Elizabeth was given a very liberal visitation schedule; she was allowed to have the children every other weekend and every other week. The agreement also contained a morals clause. The morals clause prohibited either party from allowing persons who they were sexually/romantically involved with to spend the night in the presence of the children, and it prohibited either party from consuming alcohol or illegal drugs in the presence of the children.
 

 ¶ 4. The Agreement worked well for Jonathan and Elizabeth until 2009. That year, Jonathan informed Elizabeth that he wanted to move to Niceville, Florida. On July 17, 2009, Elizabeth filed a motion to modify custody, arguing a material change in circumstances had occurred since the original divorce decree and seeking to hold Jonathan’s contempt of court for his alleged violations of the morals clause. In response, Jonathan filed a motion to modify Elizabeth’s visitation on the ground that
 
 *581
 
 it will be impractical for her to continue such visitation when he moves to Florida.
 

 ¶ 5. A hearing was held in the Chancery Court of Rankin County on August 12, 2009. At the time, Jonathan was thirty-three years old, having been born November 20, 1975, and Elizabeth was twenty-seven years old, born March 14, 1982. Several witnesses testified, and their testimonies are summarized below.
 

 1.Elizabeth Lewis
 

 ¶ 6. Elizabeth testified that, at the time of the divorce, she agreed to give Jonathan custody of their daughters because he had constantly harassed her. Now, Elizabeth stated that she wanted custody of Brooklyn and Emily because Jonathan threatened to lessen her visitation when they moved to Florida.
 

 ¶ 7. Elizabeth stated that Jonathan would bring the girls to her because he could not take care of them; thus, she had their daughters more than he did. Elizabeth also testified that: Jonathan did not take their daughters to any doctor appointments; he did not take them to school; and he was not involved in their school and extracurricular activities. She maintained that either she or Jonathan’s mother did these things.
 

 ¶ 8. Elizabeth testified that Jonathan’s employment as part owner of a nightclub prohibited him from spending time with their daughters. Conversely, Elizabeth stated that she was a stay-at-home mom and had plenty of time to devote to their daughters. Elizabeth testified that she could provide a more stable home environment for Brooklyn and Emily because: she is married to Tim Lewis, who earns $5,000 per month; they have an eighteen-month old daughter; and they own a four-bedroom trailer. Elizabeth stated that her daughters were healthy and happy until Jonathan informed them that they would be moving to Florida.
 

 ¶ 9. In regard to Jonathan’s alleged violations of the morals clause, Elizabeth testified that Jonathan had let at least five different women spend the night at his home when their daughters were present. In addition, Elizabeth stated that Jonathan had taken at least different three women on family trips with his daughters; he had let Kammie Parks, a former girlfriend, move into his home; and he and their daughters had moved in with Jessica Self, his current wife, before they were married.
 

 ¶ 10. During cross-examination, Elizabeth denied that she and Tim had relationship problems, and she denied telling Jonathan that she wanted to suspend visitation with Brooklyn because the child was causing problems between her and Tim. She also denied being intoxicated and getting into a fight at Jonathan’s bar.
 

 2. Robert Turner Jr.
 

 ¶ 11. Robert Turner Jr. testified that he was a lieutenant with the Hinds County Sheriffs Department, and he worked as a security officer at Jonathan’s nightclub. Turner was present during Elizabeth’s altercation at the nightclub. Turner stated that he was about to arrest Elizabeth’s brother when she grabbed his arm, interfering with the arrest. Turner also testified that Elizabeth was yelling at him. Turner stated that Jonathan came out, calmed everyone down, and smoothed the issue out with him. Thus, he decided not to make the arrest. On cross-examination, Turner stated that he had not seen Jonathan intoxicated at the nightclub.
 

 3. Jonathan Self
 

 ¶ 12. Jonathan testified that: he has had full custody of his daughters for two years; the girls were healthy and happy; and he has been very involved in their
 
 *582
 
 lives. Jonathan maintained that his home environment was stable because he received a generous income from his many business ventures; he was married to Jessica, who is a teacher; and Jessica and his mother helped out with the girls. Jonathan also testified that he no longer worked at the nightclub, giving him more time to spend with his daughters.
 

 ¶ 13. Jonathan testified that his house burned down in January 2009. Thereafter, he and the girls moved in with Jessica in Madison County, Mississippi. Jonathan maintained that Elizabeth was well aware of this move, and she did not voice any objections.
 

 ¶ 14. Jonathan stated that he wanted to move to Florida to get a fresh start. He talked extensively about the strong economy in Niceville and about its number-one-rated school system. Jonathan also stated that he planned to volunteer in the civil air patrol to serve his country and to pursue a career in aviation.
 

 ¶ 15. Jonathan testified that, regardless of them moving to Florida, Elizabeth’s biweekly visitation with the girls was not going to work because Elizabeth had moved from Rankin County, Mississippi to Copiah County, Mississippi, which is over an hour away. Jonathan also stated that Elizabeth had been involved in a physical altercation with Tim in front of their children, and Brooklyn had called him frantic and scared. Speaking on Elizabeth’s marriage, Jonathan stated that Elizabeth and Tim had been separated on at least two occasions in the last six months. Jonathan also testified that Brooklyn did not have a good relationship with Tim, causing Elizabeth to cease visitation with Brooklyn for up to four weeks.
 

 ¶ 16. On cross-examination, Jonathan was questioned about his business practices. Jonathan admitted that he had a car dealership that did not survive the economy. Further questioning revealed that Jonathan had faced criminal charges of six counts of attempt to defraud in connection with the car dealership. Jonathan maintained that the criminal charges stemmed from his issues with the financing company. Jonathan stated that, in an agreement with the district attorney, the charges were expunged. Jonathan was also questioned about a lawsuit filed against him for sexually assaulting a nightclub patron. Jonathan maintained that he did not sexually assault the patron and that the charges were dropped. Elizabeth’s trial counsel also asked Jonathan whether he had served alcohol to minors, and Jonathan denied the claim.
 

 ¶ 17. During cross-examination, Jonathan was also questioned about his alleged violations of the morals clause. Jonathan testified that Kammie and Jessica did spend the night at his home. However, Jonathan denied that Kammie had moved into his home, and he denied serving her alcohol. He stated that Kammie did work at his nightclub tending the beer, which is legal in Mississippi. He also testified that he only moved in with Jessica because he had lost his home to a fire. Jonathan stated that he and Jessica were engaged two weeks after he lost his home, and they got married on July 14, 2009.
 

 4. Jessica Self
 

 ¶ 18. Jessica, Jonathan’s current wife, testified that she was a school teacher. She had been previously married and divorced, and she had a nine-year-old daughter from that marriage. Jessica testified that she and Jonathan did not begin seriously dating until 2008. She had seen his daughters many times; she loved the girls; and she would do anything for them.
 

 ¶ 19. Jessica testified that Jonathan and the girls moved into her home after
 
 *583
 
 his house had burned down. She said that she offered her home to them because she had an extra bedroom and plenty of clothes for the girls. Jessica testified that Elizabeth was aware of their living situation and that she never voiced any concern to her. Jessica stated that Jonathan is a good dad; he is very involved with his daughters; and the girls have excellent grades.
 

 ¶ 20. On cross-examination, Jessica was asked whether she had spent the night with Jonathan before his house burned down, and she affirmed. Jessica also stated that she had kept the girls a few times when Jonathan went to the nightclub to check on business.
 

 5. Kammie Parks
 

 ¶ 21. Kammie, Jonathan’s former girlfriend, testified that she was only eighteen years old when the two started dating. Kammie stated that she had moved into Jonathan’s home and lived with him and the girls for nine months. She testified that he had often left the girls in her care and that they had gone on a trip to Disney World together.
 

 ¶ 22. Kammie also stated that Jonathan served her alcohol at the nightclub and at her nineteenth-birthday party at his home. Kammie also relayed that she and Jonathan were intoxicated in the presence of the girls on their trip to Disney World.
 

 ¶ 23. Kammie testified that she did not think that Jonathan was a good father because he did not spend enough time with his daughters. She stated that either she or his mother would take care of the girls.
 

 ¶ 24. On cross-examination, Kammie stated that Elizabeth did not know that she was living with Jonathan. Kammie maintained that she had not spoken with Elizabeth until she asked her whether she would be willing to testify at the hearing. Kammie testified that her relationship with Jonathan had ended in August 2008; thus, she had no knowledge of what had transpired with him and the girls since that time.
 

 ¶25. The chancellor found that, although the Agreement granted Jonathan physical custody of the children, Elizabeth’s liberal visitation presented a de fac-to joint physical custody arrangement. He ruled that Jonathan’s move to Florida was a material change in circumstances that adversely affected the children. He also determined that Jonathan’s repeated violations of the morals clause and his illegal business activities showed instability of lifestyle, which adversely affected the children.
 

 ¶ 26. After finding a material change in circumstances, the chancellor conducted an
 
 Albright
 
 analysis, which we summarize as follows:
 

 1. The age of the children did not favor either party.
 

 2. The health of the children did not favor either party. However, the sex of the children slightly favored Elizabeth.
 

 3. The chancellor considered the continuity of care since the divorce and determined that Elizabeth had spent more time with the children and had been more involved with their activities.
 

 4. The chancellor noted that both parents had excellent parenting skills. However, he found that Jonathan’s indulgence in alcohol and serving alcohol to minors were negatives. The chancellor also noted that Kammie’s story regarding Jonathan leaving Brooklyn on a soiled mattress after she had urinated on herself exhibited poor parenting. Considering the totality of the circumstances, the chancellor found
 
 *584
 
 that his factor weighed in favor of Elizabeth.
 

 5. The chancellor found that Jonathan’s employment was more stable than Elizabeth’s non-employment.
 

 6. The physical/mental health factor did not favor either parent over the other.
 

 7. Both parties had strong emotional ties to the children.
 

 8. Considering the morals of the parties post-divorce, the chancellor found that this factor favored Elizabeth.
 

 9. The chancellor found that the home, school, and community record did not favor one party over the other.
 

 10. The chancellor noted that the children’s preference was not a factor because of their youth.
 

 11. The chancellor found that the stability of home factor favored Elizabeth because she had been in a long-term, monogamous relationship, and she would offer religious training to the girls.
 

 12. Considering other factors, the chancellor noted that the girls had a half-sibling and that this favor factored Elizabeth.
 

 Ultimately, the chancellor determined that the best interests of Brooklyn and Emily would be served by giving Elizabeth physical custody of the girls. Jonathan was given visitation and ordered to pay child support.
 

 ¶ 27. Thereafter, Jonathan filed a motion to supplement the record to show that his criminal charges had been expunged. He also filed a motion to reconsider. The chancellor denied the motion to reconsider. Aggrieved, Jonathan timely appeals.
 

 ANALYSIS
 

 ¶28. Jonathan argues that the chancellor erred by finding that there was a material change in circumstances and by giving Elizabeth custody of the girls. It is important to note that Elizabeth has failed to file a brief before this Court. Typically, a party’s failure to file a brief is considered a confession of the errors alleged by the opposing party.
 
 S.S. v. S.H.,
 
 44 So.3d 1054, 1056 (¶8) (Miss.Ct.App.2010). But this Court has held that “when matters on appeal touch the welfare of a minor child, then regardless of whether a party filed a brief, this Court will ‘reach the merits of the issues in this appeal, though we proceed unaided by a brief from the appellee.’ ”
 
 Id.
 
 (quoting
 
 N.E. v. L.H.,
 
 761 So.2d 956, 962 (¶ 14) (Miss.Ct.App.2000)). Thus, we will review the merits of this action.
 

 ¶ 29. On appeal, we will not disturb a chancellor’s decision regarding custody matters unless “the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or erroneous legal standard was applied.”
 
 Sudduth v. Mowdy,
 
 991 So.2d 1241, 1243 (¶ 8) (Miss.Ct.App.2008). A modification of custody should only be granted when a material change in circumstances has occurred since the entry of the original custody order.
 
 Id.
 
 To prove that there has been a material change in circumstances, the non-custodial party must show that: “(1) there has been a substantial change in circumstances affecting the child; (2) the change adversely affects the child’s welfare; and (3) a change in custody is in the best interest of the child.”
 
 Id.
 
 (quoting
 
 Johnson v. Gray,
 
 859 So.2d 1006, 1013 (¶ 33) (Miss.2003)). The best interests of the children are always the polestar consideration in custody matters.
 
 See id.
 

 1. De Facto Joint Custody
 

 ¶ 30. Jonathan argues that the chancellor erred by determining that he and Eliz-
 

 
 *585
 
 abeth had a de facto joint custody arrangement. Jonathan and Elizabeth’s Agreement provided that the two would share joint legal custody of the girls, and Jonathan would have full physical custody of the girls.
 

 ¶ 31. Elizabeth had visitation, which was scheduled as follows:
 

 Every Other Weekend Visitation.
 
 Elizabeth shall have visitation with the minor children every other weekend, commencing at 6:00 p.m. on Friday and continuing through the following Monday at 8:00 a.m., when Elizabeth shall return the children to school, or to the custody of Jonathan....
 

 Every Other Week Visitation.
 
 For so long as Elizabeth is employed, Elizabeth shall have visitation with the minor children every other week, commencing at 6:00 p.m. on Monday and continuing through the immediate following Tuesday morning at 8:00 a.m. when Elizabeth shall return the children to school, or to the custody of Jonathan ... and said visitation shall commence that same Tuesday at 6:00 p.m. and shall continue through the immediate following Wednesday morning at 8:00 a.m. when Elizabeth shall return the children to school, or the custody of Jonathan.... [S]aid visitation shall commence that same Wednesday at 6:00 p.m. and shall continue through the immediate following Thursday morning at 8:00 a.m. Jonathan shall have custody of the minor children for all other weekdays not reserved above to Elizabeth for visitation. The intent of the parties is to allow Elizabeth every other weekday visitation with the minor children on the Monday night, Tuesday night, and Wednesday night immediately following her every other weekend visitation.
 

 ¶ 32. The chancellor determined that Jonathan and Elizabeth shared de facto joint custody stating, in pertinent part, that:
 

 In reality, although physical custody was awarded to [Jonathan] by the terms of this agreement, there has been very liberal visitation awarded to the mother. In fact, since the divorce, she has had the children on alternating weeks and more, presenting really a situation that presented a de facto legal and physical custodial arrangement between the parties over an extended period of time.
 

 The chancellor went on to compare Jonathan and Elizabeth’s situation to cases where parents shared joint physical custody and, thus, found that Jonathan’s move to Florida constituted a material change in circumstances.
 

 ¶ 33. Mississippi Code Annotated section 93 — 5—24(5)(c) (Rev.2004) states that “ ‘joint physical custody’ means that each of the parents shall have significant periods of physical custody. Joint physical custody shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents.” Jonathan and Elizabeth’s custody agreement did provide for such contact. However, the agreement explicitly stated that Jonathan had physical custody of their daughters.
 

 ¶ 34. On appeal, this Court may affirm a chancellor’s decision on alternate grounds if we determine that the right result was reached.
 
 Timms v. Pearson,
 
 876 So.2d 1083, 1086 (¶ 12) (Miss.Ct.App.2004). In this ease, we have determined that the right result was reached, but our affirmance is based on the adverse, material change in circumstances due to Jonathan’s relationships following the divorce, which involved criminal activity, and his questionable business practices.
 

 
 *586
 
 2. Material Change In Circumstances
 

 ¶ 35. The chancellor ruled that the totality of the circumstances surrounding Jonathan’s move to Florida, his violations of the morals clause, and his illegal business practices constituted a material change in circumstances, adverse to the girls. Jonathan argues that the chancellor erred by finding that his move to Florida, his violation of the morals clause, and his business practices all add up to constitute a material change in circumstances.
 

 A. Move to Florida
 

 ¶ 36. Because he had physical custody of his daughters, Jonathan argues that he had the authority to decide where they would reside, and the chancellor erred by finding a material change in circumstances without making specific findings regarding how the move would have adversely affected his daughters.
 

 ¶ 37. The law is well-settled “that [the] relocation of a parent does not necessarily result in a material change in circumstances.”
 
 Lackey v. Fuller,
 
 755 So.2d 1083, 1088 (¶ 26) (Miss.2000). However, the chancellor did not base his decision on this alone. The chancellor clearly indicated that he considered the totality of the circumstances, which included Jonathan’s repeated violations of the morals clause and his illegal business practices. These are discussed below.
 

 B. Violations of the Morals Clause
 

 ¶ 38. Jonathan argues that his relationships with other women are not sufficient grounds for the chancellor to modify custody. Jonathan is correct that a parent’s relationships or indiscretions, standing alone, are not enough to constitute a material change in circumstances.
 
 See Forsythe v. Akers,
 
 768 So.2d 943, 947 (¶ 11) (Miss.Ct.App.2000). “[B]ut if the relationship is coupled with other conduct that indicates'the custodial parent’s behavior is harmful in additional ways, custody can be changed.”
 
 Davidson v. Coit,
 
 899 So.2d 904, 909 (¶ 12) (Miss.Ct.App.2005).
 

 ¶ 39. It is apparent from the chancellor’s bench opinion that Kammie’s testimony concerned him. The chancellor stated that:
 

 Prior to his current marriage, [Jonathan Self] allowed a minor, Kammie Parks, who was [eighteen] years old, who testified before this court, who had no apparent reason to tell anything but the truth, testified to the extent that he moved her into his home to reside with him and the minor children; he allowed [her] to attend to those children; he provided Miss Parks with alcohol for her consumption on numerous occasions, they carried— that is, Miss Parks and him carried [the children] on the vacation to Florida, and the two of them got intoxicated down there on more than one occasion, and there was testimony of excessive alcohol in Mr. Selfs home on numerous occasions.
 

 Jonathan argues that Kammie’s testimony is not true. However, the chancellor is the judge of the credibility of the witnesses, and he determined that Kammie’s testimony was true. We have no reason to doubt the chancellor’s findings.
 

 ¶ 40. Jonathan maintains that the chancellor should not have punished him for his relationship with Kammie because it had ended in August 2008, and he was currently married to Jessica. Jonathan’s relationship and indiscretions with Kam-mie occurred after the original custody order. Providing alcohol to a minor is a crime, and the “[c]ommission of crimes by a custodial parent ... is properly the concern of a chancellor.”
 
 Sullivan v. Stringer,
 
 736 So.2d 514, 516 (¶ 14) (Miss.Ct.App.1999) (finding that mother’s cohabitation
 
 *587
 
 was a crime and, thus, a proper concern for the chancellor). Accordingly, we find no error in the chancellor’s ruling that Jonathan’s relationship with Kammie constituted a material change in circumstances adverse to his children’s well-being.
 

 C. Business Practices
 

 ¶ 41. Jonathan argues that the chancellor improperly punished him for his business activities that transpired well over a year prior to the trial. According to the record, Jonathan was charged with six counts of false pretenses in connection with his failed car dealership. Jonathan testified that he reached an agreement with the district attorney and Dealer Services; he successfully completed a pre trial diversion program, and the charges were expunged from his record. Jonathan testified that he owed Dealer Services $234,000. However at the custody hearing, Jonathan also testified that he was not current on his payments. Based on this evidence, the chancellor determined that Jonathan exhibited “a certain instability of lifestyle.”
 

 ¶ 42. As previously held, it is proper for a chancellor to consider a parent’s commission of crimes.
 
 Id.
 
 Although Jonathan reached an agreement with Dealer Services and the district attorney and avoided jail time, the chancellor, in his judgment, was troubled by the circumstances. We find no reason to question the chancellor’s judgment. Jonathan argues that the chancellor failed to state how the children were adversely affected by his business practices. We disagree. The chancellor explicitly stated that Jonathan’s business practices exhibited “a certain instability of lifestyle,” and we agree that this instability would adversely affect the children.
 

 ¶ 43. Accordingly, we find that the chancellor did not err by finding that Jonathan’s business practices following the original custody order constituted a material change in circumstances. This argument is without merit.
 

 3.
 
 Albright
 
 Analysis
 

 ¶ 44. After finding a material change in circumstances, the chancellor underwent an
 
 Albright
 
 analysis to determine who should have custody of Brooklyn and Emily. Jonathan argues that the chancellor erred in his analysis on the issues of the sex of the children, continuity of care, moral fitness, and stability of the home.
 

 A. Sex of the Children
 

 ¶45. Brooklyn and Emily are both girls. At the time of the hearing, Brooklyn was eight years old and Emily was six years old. The chancellor determined that the age and health of the children did not favor either parent, but the sex of the children slightly favored Elizabeth. Jonathan argues that the chancellor ignored the fact that he had successfully taken care of the girls for two-and-a-half years. However, we find no reversible error in the chancellor’s decision on this factor.
 

 B. Continuity of Care
 

 ¶46. The chancellor determined that this factor favored Elizabeth because she spent more time with the children, and she was involved with their extracurricular and school activities. Jonathan argues that the chancellor ignored the facts that (1) he had physical custody of the children; (2) since the divorce, the children have resided with him under his care and supervision; and (3) Elizabeth and Tim voluntarily moved from Rankin County to Copiah County, placing distance between themselves and the children.
 

 ¶ 47. Although the Agreement provided Jonathan with physical custody of the chil
 
 *588
 
 dren, Elizabeth had the children equal amounts of time as Jonathan given her liberal visitation schedule. Practically speaking, the children were spending equal, if not more, time in the physical custody of their mother rather than their father. Also, Elizabeth testified that Jonathan would often bring the children to her during his scheduled custody time, and Jessica and Jonathan’s mother often took care of the children for Jonathan. Jonathan did not refute her statements. Regarding Elizabeth and Tim’s move to Copi-ah County, there was no evidence that the move prevented Elizabeth from exercising her regular visitation.
 

 ¶ 48. The chancellor’s decision on this issue was a close call, and we cannot say that the chancellor erred in his determination.
 

 C. Moral Fitness
 

 ¶ 49. Because Jonathan provided alcohol to a minor, violated the morals clause, and participated in illegal business practices, the chancellor determined that this factor favored Elizabeth. Jonathan argued that the chancellor ignored the fact that Elizabeth was an adulterer. He also maintains that his relationship with Kam-mie ended well over a year before trial and that the chancellor ignored the fact that the girls were presently living in a loving, nurturing, family environment.
 

 ¶ 50. In regard to Elizabeth’s adultery, this occurred before the divorce and original custody order. Thus, it would not have been a proper factor for the chancellor to consider during the modification hearing. Although Jonathan and Kammie were no longer dating, Jonathan’s indiscretions with Kammie occurred after entry of the original custody order. Thus, it was properly considered by the chancellor. This argument is without merit.
 

 D. Stability of the Home
 

 ¶ 51. The chancellor determined that this factor favored Elizabeth because she had been a long-term monogamous relationship since the original custody order, and she has offered religious training to the children. Jonathan argues that he and Jessica had also been in a long-term monogamous relationship, and the children had lived with them for nine months. Thus, Jonathan maintains that the chancellor erroneously found that this factor favored Elizabeth.
 

 ¶ 52. The record shows that Jonathan and Jessica had married after Elizabeth had filed for a modification of custody and shortly before Jonathan had filed his cross-petition for modification of visitation. The chancellor could have definitely taken this into consideration in making his decision. Regardless, the chancellor based his decision to award custody to Elizabeth on his analysis of all of the
 
 Albright
 
 factors. Viewing the chancellor’s analysis in its entirety, we find that the chancellor did not abuse his discretion. This argument is without merit.
 

 CONCLUSION
 

 ¶ 53. The chancellor did not err by finding that Jonathan’s relationships following the divorce and his business practices constituted a material change in circumstances. We also find that there is substantial evidence in the record supporting the chancellor’s decision to modify custody of the children from Jonathan to Elizabeth.
 

 ¶ 54. THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, ISHEE, CARLTON AND
 
 *589
 
 MAXWELL, JJ„ CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.